# THE CITY OF SPRINGFIELD

*v.*

# NINIAN W. EDWARDS.

1. INJUNCTION—*who may enjoin municipal corporation from incurring debts beyond revenues.* A resident and tax-payer of a municipal corporation has such an interest in its affairs, as to entitle him to an injunction to prevent the incurring of indebtedness in excess of that allowed by the constitution and laws.

Syllabus.

| 84 | 626 |
|---|---|
| 186 | [4]311 |
| 84 | 626 |
| 97a | [2]591 |
| 84 | 626 |
| 109a | [4]577 |
| 84 | 626 |
| 112a | 646 |

2. CONSTRUCTION—*rule as to laws.* In the construction of a constitutional provision or statute, resort will be had to the natural signification of the words employed, and in the order and grammatical arrangement in which they are placed, and if, when thus regarded, the words used embody a definite meaning, which involves no absurdity and no contradiction between different parts of the law, then such meaning will be adopted as the one intended.

3. MUNICIPAL INDEBTEDNESS — *constitutional limitation.* A debt payable in the future, or payable upon a contingency, or the happening of some event, such as the rendering of service or the delivery of property, as well as a debt payable presently and absolutely, is within the constitutional prohibition relating to the incurring of debts by municipal corporations, and it makes no difference whether the debt be for current expenses or for something else.

4. But appropriations may be made or warrants drawn upon the treasury in anticipation of taxes to be thereafter collected, provided the tax, at the time of the appropriation, be actually levied, and the legal effect of the contract between the corporation and the individual, made at the time of the appropriation, be such that it shall operate to prevent any liability to accrue on the contract against the corporation. Where a fund is provided to meet the same, the appropriation or warrant creates no liability, but one thing is simply exchanged for another.

5. MUNICIPAL CORPORATION—*liability for not collecting tax to pay appropriations made on its faith.* For any failure of the proper officers to collect and pay over taxes in accordance with the appropriations, the remedy must be against the officers and not against the corporation, otherwise a contingent debt would be incurred.

6. SAME—*power of its officers.* City authorities can exercise only such powers in its name and in its behalf as are expressly conferred by its organic law, or as are incidental and necessary to carry into effect the objects of the corporation.

7. ERROR—*what may be assigned.* Neither an appeal nor writ of error will lie on a simply interlocutory order, therefore error can not be assigned upon an order for attachment for disobeying an injunction, when no judgment is rendered against the party on the final hearing.

8. TAXES—*who must collect.* The collector of the city of Springfield has no authority to collect city taxes where the same have been certified to the county clerk and extended by him, but the same must be collected by the same officers whose duty it is to collect State and county taxes.

WRIT OF ERROR to the Circuit Court of Sangamon county; the Hon. CHARLES S. ZANE, Judge, presiding.

Mr. E. B. Herndon, Mr. J. C. Snigg, and Mr. James A. Kennedy, for the plaintiff in error.

Mr. Ninian W. Edwards, *pro se.*

Mr. Justice Scholfield delivered the opinion of the Court:

This was a bill in chancery, by a citizen and tax-payer of the city of Springfield, to enjoin the municipal authorities of that city from incurring indebtedness and levying and collecting taxes in violation of the city charter and the constitution of the State.

The decree finds, as facts proved, and which support the material allegations of the bill, that at no time since the adoption of the present constitution has the debt of the city been less than $850,000, and that the taxable property therein, as ascertained by assessment for State and county taxes, has, at no time during that period, exceeded $6,000,000, but that, notwithstanding this, the city has incurred indebtedness aggregating as follows: On the 1st of March, 1871, $4171.89; on the 1st of March, 1872, $51,189.02; on the 1st of March, 1873, $70,249.91; on the 1st of March, 1874, $101,914.90.

It further finds, that money was borrowed by the city. for which warrants were issued, amounting to $97,680; that, also, the further sum of $34,601.81 was borrowed by the city, for which bonds were issued amounting to $37,000, when the interest of the outstanding indebtedness of the city for that and previous years amounted to not less than $70,000 per annum, and the revenue for the ordinary taxes of the preceding year amounted to $81,066.25; that in said loans to the city for which warrants were issued, the warrants were made payable at a future day, and interest at ten per cent per annum was taken out in advance, and it was provided, if the warrants were not paid when due, they should bear ten per cent interest until paid; that said warrants were issued when there were no funds in the treasury for their payment; that appropriations made by the city council for the payment of interest for improvements and for city expenses, exceeded the amount of the whole

ordinary revenue of the city for the fiscal year immediately preceding, and that money has been paid out of the treasury of the city for which no appropriations by ordinance were made.

The decree perpetually enjoins the municipal authorities, in the following language, "from incurring any indebtedness in any manner or for any purpose, including existing indebtedness, in the aggregate exceeding five per centum on the valuation of the taxable property in said city, to be ascertained by the last assessment for State and county taxes, previous to the incurring of any additional indebtedness, and from making, in any fiscal year, appropriations, or levying taxes for the payment of interest for improvements and for city expenses in excess of the ordinary revenue of the fiscal year immediately preceding, unless, in the payment of interest on the public debts of the city, they shall provide according to law, by taxation or otherwise, some additional fund out of which such excess of appropriations may be made to meet such indebtedness, or from issuing any warrants or authorizing their issue for the payment of any money when there are no means in the city treasury for their payment, or from issuing the same to bear interest, or to become due at a future day, or for the payment of any money out of the treasury, without, by ordinance, making appropriation therefor, or from assessing and collecting taxes for the year 1874 in any other manner than is provided for under the general revenue laws of the State for the assessment and collection of taxes, or from borrowing money when the interest on the outstanding indebtedness shall exceed the one-half of the city revenue arising from the ordinary taxes within the city for the year immediately preceding," etc.

It is provided by § 12, art. 9 of the present constitution, that "no county, city, township, school district, or other municipal corporation, shall be allowed to become indebted, in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes, previous to the

incurring of such indebtedness. Any county, city, school district or other municipal corporation incurring any indebtedness, as aforesaid, shall, before or at the time of doing so, provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof within twenty years from the time of contracting the same." * * *

By the first clause of section 4, art. 5, of the "Act to reduce the act incorporating the city of Springfield, and the several acts amendatory thereof, into one act, and to amend the same," approved March 2, 1854, (Laws of 1854, p. 44,) it is enacted: "The city council * * * shall have power * * * to borrow money on the credit of the city, and issue the bonds of the city therefor; but no sum of money shall be borrowed at a higher rate of interest than the rate allowed by law, nor shall a greater sum or sums be borrowed, or at any time outstanding, the interest upon the aggregate of which shall exceed the one-half of the city revenue arising from the ordinary taxes within the city for the year immediately preceding, and no bonds shall be issued or negotiated at less than par value. The appropriations of the city council for payment of interest for improvements and for city expenses, during any one fiscal year, shall not exceed the amount of the whole ordinary revenue of the city for the fiscal year immediately preceding; but the city council may apply any surplus money in the treasury to the extinguishment of the city debt, or to the creation of a sinking fund for that purpose, or to the carrying on of the public works of the city, or to the contingent fund, for the contingent expenses of the city."

By the 13th section of "An act to amend the charter of the city of Springfield," approved February 21, 1861, (Private Laws of 1861, p. 289,) the controller of the city is required, in the month of April in each year, to submit to the council, among other reports, one showing the aggregate income of the preceding fiscal year, from all sources; and it is provided, that "in no event shall the city council make the current appropriations of any year exceed in amount the income of the city

during the preceding year, as ascertained by the controller in his said statement, unless in the payment of interest on the public debts of the city. They shall provide, according to law, by taxation or otherwise, some additional fund, out of which such excess of appropriations may be made to meet such indebtedness."

And by the 16th section of the same act it is provided, that " all warrants drawn upon the treasurer must be signed by the controller, and countersigned by the mayor, stating therein the particular fund or appropriation to which the same is chargeable, and the person to whom payable, and no money shall be paid otherwise than upon such warrants so drawn."

It thus appears that the decree follows, with almost literal fidelity, the language of the constitution and that of the city charter combined; and the only question, therefore, that can arise is, does the case made show any necessity for such injunction?

We may dismiss the objection that the complainant does not show in his bill that he is injured by the acts complained of, otherwise than in common with all other tax-payers in the city, with the observation that it has been held in this State that such an injury is sufficient to entitle him to an injunction, and that the question is not open to further discussion. *Colton et al.* v. *Hanchett et al.* 13 Ill. 615; *Perry et al.* v. *Kinnear et al.* 42 id. 160; and *Beauchamp* v. *Board of Supervisors, etc.* 45 id. 274.

Appellant contends that when liabilities are created and appropriations are made, which are within the limits of the revenue accruing, to meet them, they are not debts within the meaning of the prohibition of the constitution; and that temporary loans are not, when within the limits of the revenue expected to be realized.

The first branch of this position has support in *Grant* v. *The City of Davenport et al.* 36 Iowa, 396, *People* v. *Pacheco*, 7 Cal. 175, *Koppekus* v. *State Capitol Commissioners*, 16 id. 253, *The State* v. *McAuley*, 15 id. 455, *The State* v.

*Medberry et al.* 7 Ohio St. 522, and *State* v. *Mayor*, 23 La. An. 358.

These cases maintain the doctrine that revenues may be appropriated in anticipation of their receipt, as effectually as when actually in the treasury; that the appropriation of moneys when received meets the services as they are rendered,— thus discharging the liabilities as they arise, or rather anticipating and preventing their existence.

In considering what construction shall be given to a constitution or a statute, we are to resort to the natural signification of the words employed, in the order and grammatical arrangement in which they are placed; and if, when thus regarded, the words embody a definite meaning, which involves no absurdity, and no contradiction between different parts of the instrument, then such meaning is the only one we are at liberty to say was intended to be conveyed.

There is no difficulty in ascertaining the natural signification of the words employed in the clause of the constitution under consideration, and to give them that meaning involves no absurdity or contradiction with other clauses of the constitution. The prohibition is against becoming indebted—that is, voluntarily incurring a legal liability to pay, "*in any manner or for any purpose,*" when a given amount of indebtedness has previously been incurred. It could hardly be probable that any two individuals of average intelligence could understand this language differently. It is clear and precise, and there is no reason to believe the convention did not intend what the words convey.

A debt, payable in the future, is, obviously, no less a debt than if payable presently; and a debt payable upon a contingency, as, upon the happening of some event, such as the rendering of service or the delivery of property, etc., is some kind of a debt, and therefore within the prohibition. If a contract or undertaking contemplates, in any contingency, a liability to pay, when the contingency occurs the liability is absolute—the debt exists—and it differs from a present, unqualified promise to pay, only in the *manner* by which the

indebtedness was incurred.   And, since the *purpose* of the
debt is expressly excluded from consideration, it can make no
difference whether the debt be for necessary current expenses,
or for something else.

In this view, we are only prepared to yield our assent to the
rule recognized by the authorities referred to, with these quali-
fications: First, the tax appropriated must, at the time, be
actually levied; second, by the legal effect of the contract be-
tween the corporation and the individual, made at the time of
the appropriation, the appropriation and issuing and accept-
ing of a warrant or order on the treasury for its payment, must
operate to prevent any liability to accrue on the contract
against the corporation.

The principle, as we understand, is, there is, in such case,
no debt, because one thing is simply given and accepted in
exchange for another.   When the appropriation is made and
the warrant or order on the treasury for its payment is
issued and accepted, the transaction is closed on the part of
the corporation—leaving no future obligation, either absolute
or contingent, upon it, whereby its debt may be increased.
But until a tax is levied, there is nothing in existence
which can be exchanged; and an obligation to levy a tax
in the future, for the benefit of a particular individual, neces-
sarily implies the existence of a present debt in favor of the
individual against the corporation, which he is lawfully enti-
tled to have paid by the levy.   If the making of the appro-
priation and issuing and accepting a warrant for its payment
does not have the effect of relieving the corporation of all
liability, or, in other words, if it incurs any liability thereby,
it must, manifestly incur, either absolutely or contingently, a
debt.

Where a warrant or order, payable from a specific appropri-
ation of a tax levied but not yet collected, is accepted in
exchange for services rendered or to be rendered, or for mate-
rials furnished or to be furnished, so that there is, in fact, but
the exchange of one thing for another, the duty remains for
the proper officers to collect and pay over the tax in accord-

ance with the appropriation—but, obviously, for any failure in that regard, the remedy must be against the officers and not against the corporation, for, otherwise, a contingent debt would, in this way, be incurred by the corporation.

The facts here found as proved, and about which there seems to be no dispute, show an increase in the city debt, in plain and palpable violation of the constitution, each year since the adoption of that instrument. At no time, since the adoption of the constitution, has its outstanding indebtedness been less than five per centum on the value of the taxable property of the city, as ascertained by the annual assessments for State and county purposes, but, to the reverse, it has constantly been largely in excess of that amount; and yet, its indebtedness was augmented, March 1, 1871. $4171.89, March 1, 1872, $51,189.02, March 1, 1873, $70,249.91, and March 1, 1874, $101,914.90. It is impossible that this could have been for current expenses, and satisfied by appropriating to their payment the current revenues, as levied each year. If such expenses had been thus satisfied, there could have been no debt left standing—for, whether the appropriation were made at the beginning or the end of the fiscal year could make no difference, since, in either case, it must satisfy and discharge the current expenses for the year.

The facts found as proved, likewise show the borrowing of money and contracting to pay interest thereon, and the payment of money from the treasury, in direct violation of the letter and spirit of the organic law of the city. This is indefensible. Those representing the city can exercise only such powers, in its name and on its behalf, as are expressly conferred by its organic law, or as are incidental and necessary to carry into effect the objects of the incorporation. "Much less can any power be exercised or act done, which is forbidden by statute." Dillon on Municipal Corp. § 55.

Objection is urged, that the court below erred in the proceedings by attachment against the aldermen for disobedience to the preliminary injunction. As no judgment was rendered against the aldermen on the final hearing, it is impossible to

see how they have been prejudiced by the attachment. It has been held, in numerous cases, that neither an appeal nor writ of error will lie on a simply interlocutory order.

The city collector was not authorized to proceed to collect the tax. *The People ex rel.* v. *Cooper,* 83 Ill. 585. The tax having been certified to the county clerk, should have been collected by the same officers by which State and county taxes are collected.

We see no cause to disturb the decree, and it is, accordingly, affirmed.

*Decree affirmed.*

Mr. Justice Scott dissenting.

Mr. Justice Dickey, dissenting: I can not concur in the views expressed, as to the extent and subject matter of the limitation found in the constitution. The section in question, stripped of all verbiage not applicable to a city, is as follows:

" No city shall be allowed *to become indebted,* in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein. Any city incurring any indebtedness, *as aforesaid,* shall, before or at the time of doing so, provide for the collection of a direct *annual* tax sufficient to pay the *interest* on *such* debt as it falls due, and also to pay and discharge the principal thereof within *twenty* years from the time of contracting the same. This section shall not be construed to prevent any city from issuing *its bonds* in compliance with any vote of the people which may have been had prior to the adoption of this constitution, in pursuance of any law providing therefor."

The question presented is, what is meant by the words " to become indebted," *as used* in this section?

I concur fully in the proposition, that " in considering what construction shall be given to a constitution, we are to resort to the natural signification of the words employed, in the order and grammatical arrangement in which they are placed, if,

when thus regarded, the words embody a definite meaning, which involves *no absurdity* and *no contradiction* between *different parts* of the instrument;" and I concur in the position, that in *such* case that " definite meaning " is " the *only one* we are at liberty to say was intended to be conveyed." I concur, also, in the position, that "there is no difficulty in ascertaining the natural signification of the words employed in the phrase ' to become indebted,' " if *taken alone*, and that these words when taken alone, in their *natural significa- tion*, embrace *every kind* of indebtedness which may or can be incurred. I concede, too, that the prohibition in the first clause of this section, if the words be taken *alone*, in their literal and natural signification, without reference to the *unreasonable* results therein involved, and without reference to the expressions in other parts of the same section, must be held to forbid the incurring of *any kind* of debt, in any man- ner or for any purpose, beyond the limit prescribed. All this is made very plain by the reasoning of the Chief Justice. But I can not concur in the position, that " to give them that meaning involves no absurdity or contradiction with other clauses of the constitution." No attempt is made to support *this* position, by either argument or authority. It is left to stand *simply* upon the statement of the position, as one hav- ing the sanction of the court. No attempt is made to show that the meaning attributed by the court to these words, (which I concede to be the literal, usual and natural meaning thereof,) " involves no absurdity and no contradiction with other clauses of the constitution."

To my mind, the construction adopted does, in its necessary consequences, involve results so unreasonable, that they must be denominated absurd; and does at the same time involve a plain contradiction of other words in the *very same section*.

And first, as to the allegation of absurdity,—it seems to me that the broad and sweeping meaning now attributed to the words, " to become indebted," found in the first clause of this section, necessarily involves results so astoundingly ruinous and disastrous, that it is simply incredible that the convention

which framed the constitution, or the people who adopted it, could have intended to convey that idea by these words.

In 1870, when this constitution was framed and adopted, it was well known, as a matter of public history, that three-fourths of all the cities in the State were already respectively indebted, and had issued their bonds, for an amount beyond the limit expressed. It was also well known as a matter of public history, that the revenues, not only of cities and counties, but of the State, were never collected in full during the fiscal year for the expenses of which such revenues were provided. In fact, the provisions of law, on the face of the statutes relating to the collection of the revenue, then were and ever since have been such that none of the revenue for any given fiscal year could, by law, be collected until the latter part of such year, and a large part could not be collected until after the whole of the fiscal year had passed.

If, then, this constitution meant, that no liability, of any nature, which might ripen into what in any sense might be called a debt, should be incurred by cities whose public debt was then beyond the limit mentioned in the constitution, it meant simply that three-fourths of all the cities in the State should cease at once to perform the functions for which they were created.

Such a city could not do anything towards the performance of any function it was provided to perform. Its treasury had no money applicable to the current expenses of that year. Its mayor, clerk, chief of police, policemen and firemen could not lawfully be paid for current services, for there was no money which could be lawfully applied to that purpose. If all its officers and employees should go on doing their respective duties, and any one of them should, at any time afterwards, sue the city for his services, no judgment, upon this theory, could be rendered against the city in his favor, for the city so situated could not lawfully "*become indebted.*" And, before he could recover by any law that I know of, the plaintiff must, in such case, show that the city had become indebted to him, which, upon this theory, is constitutionally impossible. Nor

could such officers or employees, upon the logic of this ruling, be lawfully paid by any officer of the city, at any time after the rendering of such services, even if the money levied for that purpose had come into the treasury, for it is not lawful to pay out the money of the city to men to whom the city *owes* nothing. If I understand the theory of the rule laid down, it involves the idea that a city, which has reached the constitutional limit of indebtedness, can lawfully procure materials or services only in two ways: One, that it may wait until it in some way has money in the treasury for that purpose, and then materials and services may be paid for in advance, or as received or performed, but not afterwards; and the other, that when a tax has actually been levied, a city may procure money, materials or services by paying for them in advance, or when received or performed, in orders on the treasury, to be paid only out of that levy,—the party accepting the order to take all hazards as to the delay or uncertainty of the collection, and as to the fidelity of the county collector and city treasurer in collecting and paying over the money. In other words, as to a city in that situation, the theory involves the proposition, that all its transactions must be accomplished by paying, in one way or another, in advance, or simultaneously with the matter received by the city, and not after.

It is plain that the use of this kind of certificates or special orders on the fund to come from the levy would be ruinous to any city. The laborer who repairs a street or sidewalk, or turns a bridge for a city, or a fireman or a policeman who lives from day to day upon his earnings, can not wait ten months for his pay. If he is paid in such special orders, he must have a larger amount, so that, after selling at a discount, he can realize an adequate reward for his labor. Labor, paid for in such orders, or by money raised by the sale of such orders, which might be had for $1 in cash, would require, in many cases, orders for $2. True economy demands that the city have power to assure the payment of the temporary loan, whereby the money may be had at about seven per cent per annum.

A city indebted beyond the constitutional limit, at the adoption of the constitution, without money in its treasury, had, under this construction of this clause, no power to repair a dangerous sidewalk or street, to open or close a bridge across a river in its midst, to put out a destructive fire, to feed its poor, to imprison its offenders, to maintain its schools, or even to collect its first year's taxes. Unless a city in such condition (and most of our cities were in that condition in 1870) can lawfully anticipate the collection of its revenues, and raise ready money, by temporary loans, to pay the current expenses of that year, the results alluded to must necessarily follow. To hold that the convention, in framing this constitution, or that the people, in adopting it, intended to accomplish such results by it, is to stultify its authors. Had the framers of this constitution attributed the meaning here adopted to the words, "to become indebted," can it be believed that they would have saved so carefully from its operation certain bonds mentioned in the last clause of the section, and have omitted to add words saving to such cities the power to provide for the payment of their necessary current expenses? The literal meaning of a prohibition against "becoming indebted" in any sense, in any manner or for any purpose, would involve a prohibition against a city becoming further indebted, even by the accumulation of interest on the bonded debt existing at the adoption of the constitution. It will not be contended that such prohibition was intended, and why not? Simply because such a proposition is absurd. By the same reasoning, it seems to me that the meaning now adopted ought to be rejected.

Like words in the constitutions of other States have, by the courts of last resort, been held to have no application to temporary liabilities for current expenses not exceeding the amount of the current tax levy. It is so held in Ohio, Iowa, California and Louisiana, and I know of no contrary decision.

Secondly, as to the alleged contradiction of other words in the instrument,—not only should the present construction be rejected because of the unreasonable results which it necessarily involves, but also because it involves a plain contradiction of the words found in the second clause of the same section.

In giving this broad and sweeping construction to these words, no notice is taken of the use of the words, "*as afore-said*," found in the second clause of this same section, and these words are thus rendered utterly meaningless. Without saying so, they are rejected as mere surplusage. This is not allowable. Every constitution or statute must be so construed as to give some proper effect, if possible, to every word and phrase in the instrument.

To my mind, the words, "as aforesaid," in the second clause of the section, say plainly, that the "becoming indebted," in the first clause, (wherein a limit as to amount is placed upon the same) is the same thing spoken of as "the incurring any indebtedness," in the second clause, and by which clause (when not exceeding the limit in the first clause) the proceeding is regulated. In other words, the language of the whole section imports that the doing of a *certain thing* beyond a given limit, is *forbidden* in the *first clause*, and the mode of doing *that same thing*, when not beyond the limit, *is regulated* by the *second clause*. The subject matter of the two clauses is expressly declared by the words, "as aforesaid," to be *identical*. Of this, it seems to me there can be no doubt. If the words, "incurring any indebtedness as aforesaid," do not mean this, what do the words, "as aforesaid," mean? No one can imagine that the incurring "as aforesaid" means the incurring of indebtedness beyond the limit prescribed, for that would license the very thing prohibited, which would be absurd. Yet this is the office of the words, "as aforesaid," taken in their literal, natural signification and grammatical order. Literally, this section says to cities, you must not go in debt beyond a given limit, but when you do so exceed the limit, you must provide for the payment of the interest annually, and of the principal within twenty years. This is the natural, grammatical and literal meaning of the words, "as aforesaid," as clearly so as is the meaning attributed to the words, "to become indebted," by following their natural, grammatical and literal signification. We unite in rejecting that natural, grammatical and literal signification of the words, "as aforesaid," be-

cause it involves a contradiction of the first clause. By the same process, we must reject the natural, grammatical and literal signification of the words, "to become indebted," because they contradict the words in the second clause, and we must seek some reasonable meaning for the words, "to become indebted," and for the words, "as aforesaid," which *will not contradict each other* when properly interpreted.

I have shown that the subject matter of the first and second clauses must be taken to be identical—that is, that *the thing* which is *regulated* by the *second* clause, is *identically* the *same thing* which is *limited* in the first clause. To ascertain what that subject matter is, we must find some subject matter to which all the words of both clauses may appropriately apply. The first clause has no words to guide us, except the general words, "to become indebted." The words, "in any manner or for any purpose," do not help us. They do not describe the thing forbidden. They only say that the prohibition shall not be evaded by the manner of doing the forbidden thing, or in view of *the purpose* for which the thing forbidden is proposed to be done; but they give no further clue to the solution of the question of what that forbidden thing is. If the words had been, no city shall be allowed to become indebted *in any sense*, etc., the words, "in any sense," would preclude all search for a sense in which "becoming indebted" was not forbidden, but such words are not found in the constitution.

Let us examine the second clause of the section, and see if there are any words in that clause which will enlighten us as to the subject matter of that clause. The words are: "Any city incurring any indebtedness as aforesaid * * * shall provide for * * * a direct *annual* tax sufficient to pay the interest on *such* debt as it falls due, and, also, to * * * discharge the principal thereof within twenty years." Here, we plainly learn that the subject matter spoken of in the second clause, is a *debt of such character* as usually bears interest, and such as will require an "*annual tax*" to pay interest upon it annually as it falls due, and such a debt that its prin-

41—84th Ill.

cipal is not to be discharged within one year. If I am right in saying that the thing limited in the first clause, is the same thing which is regulated by the second clause, (as shown by the words "as aforesaid,") it necessarily follows that the thing limited in the first clause is a debt of such character as requires "an annual tax" to pay interest upon it annually as the interest falls due, and such that its principal is not payable within one year. Such a debt is not to be incurred in any manner or for any purpose, beyond the limit prescribed in the constitution. This construction gives harmony to every word in the section, and rejects none. The construction adopted by my brethren destroys some of the words of the section, and to sustain such construction, the words "as aforesaid," in the phrase "incurring any indebtedness as aforesaid," and the word "such," in the phrase "such debt," must be rejected as nugatory.

The true meaning of this section will, perhaps, be more apparent by transposing the clauses, and reading them thus: "Any city incurring any indebtedness shall, before or at the time of doing so, provide for the collection of a direct annual tax, sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof, within twenty years from the time of contracting the same. No city shall be allowed to become indebted *as aforesaid* in any manner or for any purpose, to an amount, including present indebtedness, in the aggregate exceeding five per centum of the value of the taxable property therein, to be ascertained," etc. "This section shall not prevent any city from issuing its bonds in compliance with any vote of the people which may have been had prior to the adoption of this constitution, in pursuance of any law providing therefor."

It will be observed that the exact words of the section are all here preserved. It seems to me, no one can contend that the true meaning of the section is at all changed by the transposition. If not, my construction is necessarily the true one on the face of the section.

The view which I take is somewhat fortified by the fact

that the exception in the third clause of the section relates expressly to a bonded debt, and tends to show that it was that class of liability which was in mind when the section was framed.

This view is also strengthened, from the fact that at the time of its adoption by the convention, this section was declared, in debate by members of the convention, to have reference alone to the bonded debt of cities; and no member of the convention expressed a different view. The people voted for the constitution in the light of this construction. It may be that the debates are not to be resorted to where there is no room for construction; but where the meaning of the words, from any cause, is in doubt, the debates may be considered.

The true solution of this question, as I verily believe, rests in the position that this limitation in the constitution has reference *only* to funded or permanent debts—to such debts as usually bear interest payable annually, and such as are not payable within the current fiscal year; and that it is a perversion of the true meaning of the constitution, to give it application to temporary liabilities, payable within the fiscal year, and not exceeding the amount of the tax levy for that year.

This view gives reasonable and proper force to every word and phrase in the constitution, brings all its words and phrases into harmony, doing violence to none, and involves no unreasonable and impracticable results. In my humble judgment, it presents the true meaning of that instrument.