THE CITY OF CHICAGO *et al.*

*v.*

MICHAEL C. MCDONALD.

*Opinion filed October 24, 1898—Rehearing denied December 14, 1898.*

1. CONSTITUTIONAL LAW—*section 12 of article 9 of the constitution construed.* An obligation payable in the future upon a contingency, such as the rendering of services or the delivery of property, is a debt, within the meaning of section 12 of article 9 of the constitution, which prohibits municipal corporations from becoming indebted beyond five per cent of value of taxable property therein.

2. MUNICIPAL CORPORATIONS—*city in debt beyond constitutional limitation cannot make contracts for current expenses.* A city having an aggregate indebtedness exceeding the constitutional limitation of five per cent is powerless to create any additional debt, even for its ordinary and current expenses, and no contract for the payment of money made while the city is so situated can be enforced.

3. SAME—*effect where total indebtedness under contract would overreach the constitutional limitation.* If, at the time of making a contract extending over a number of years and calling for periodical payments, the city is not indebted beyond the constitutional limit, the total

amount of indebtedness entailed by the contract is not the test of the validity of the whole contract, and if the contract is divisible it may be enforced to the extent of the difference between the existing municipal indebtedness and an amount equal to the constitutional limitation. (*City of East St. Louis* v. *Gas Light and Coke Co.* 98 Ill. 415, and *City of Carlyle* v. *Water Co.* 140 id. 445, explained.)

4. SAME—*a contract for removal of garbage creates a debt.* A contract by a municipal corporation for the removal of garbage, which calls for monthly payments as the work progresses, creates a debt, within the meaning of the constitution, and cannot be enforced if, at the time of making the contract, the municipal corporation was already in debt in excess of the constitutional limit.

5. SAME—*in estimating aggregate indebtedness, amount in the treasury should not be deducted.* In determining the aggregate indebtedness of a municipal corporation the amount in the treasury should not be deducted from the sum total of the debts, as the question is one of indebtedness and not of insolvency.

6. SAME—*"water loan" bonds constitute an indebtedness.* "Water loan" bonds issued by a city in the same form as its other bonds except as to name, constitute an indebtedness, within the meaning of the constitution, even though it is expected that they will be paid out of the profits of the water system, as, should such expectation not be realized, the city would be required to pay them, and, if necessary, raise the amount by general taxation.

PHILLIPS and CARTWRIGHT, JJ., dissenting.

APPEAL from the Circuit Court of Cook county; the Hon. MURRAY F. TULEY, Judge, presiding.

CHARLES S. THORNTON, and GRANVILLE W. BROWNING, (DARROW, THOMAS & THOMPSON, of counsel,) for appellants.

JOHN MAYO PALMER, and A. B. JENKS, for appellee.

Mr. JUSTICE WILKIN delivered the opinion of the court:

On December 15, 1897, Michael McDonald, on behalf of himself and other tax-payers of Chicago who would come into the suit and contribute to the expense thereof, filed his bill in chancery against the city of Chicago, Lawrence E. McGann, its commissioner of public works, Patrick Mulcaire and Francis C. Burk, partners, John Dowdle

and Marvin Chamberlain, partners, and R. T. Hanrahan and J. T. Downey, partners. The prayer of the bill was that the defendants be perpetually enjoined from carrying into effect certain contracts by the city, through said commissioner of public works, with the other defendants, for the removal of garbage in designated districts of the city. The bill was afterwards amended and a motion made for a temporary writ of injunction, which was heard on the bill and answer of the defendants and a temporary writ ordered. Subsequently leave was had to file a new answer, and upon it the defendants moved to dissolve the injunction. Upon that motion the cause was tried as on a final hearing, and a decree entered overruling the motion and decreeing that the injunction be made perpetual. To reverse that decree this appeal is prosecuted.

The principal question raised in this court is whether or not the contracts in question are illegal and void under that section of our constitution which prohibits cities from becoming indebted in excess of five per cent on the valuation of their taxable property. This question presents for determination two propositions: First, do the contracts create an indebtedness, within the meaning of the constitution; and second, was the city of Chicago indebted beyond the prescribed limit at the time of entering into the contract.

The language of section 12 of article 9 of the constitution of 1870 is: "No county, city, township, school district or other municipal corporation shall be allowed to become indebted, in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes previous to the incurring of such indebtedness."

While there would seem to be little difficulty in determining whether or not a city becomes indebted by entering into a particular contract for municipal purposes, it

has not been found easy to do so in all cases within the meaning of constitutional and statutory provisions like this, the result being a conflict in the decisions of courts in different States. Some have held that a contract by a municipality to pay for the annual supply of necessaries, such as light and water, upon rendering the services or furnishing the supplies, is not the incurring of a present indebtedness in the constitutional sense; but this court is committed to a contrary construction. Being called upon to construe the foregoing section of our constitution in the case of *City of Springfield* v. *Edwards*, 84 Ill. 626, Justice SCHOLFIELD, rendering the majority opinion of the court, said (p. 632): "In considering what construction shall be given to a constitution or a statute we are to resort to the natural signification of the words employed, in the order and grammatical arrangement in which they are placed; and if, when thus regarded, the words embody a definite meaning, which involves no absurdity and no contradiction between different parts of the instrument, then such meaning is the only one we are at liberty to say was intended to be conveyed." Justice DICKEY, in his dissenting opinion, conceded the rule of construction as stated in the majority opinion, also the meaning of the words of the constitution as defined by Justice SCHOLFIELD, but he dissented from the view that to give those words that meaning would involve no absurdity or contradiction with other clauses of the constitution. It thus clearly appears that the words "to become indebted" were, after full consideration, given by the court in that case their natural signification, and Justice SCHOLFIELD proceeds to determine their meaning, as follows: "There is no difficulty in ascertaining the natural signification of the words employed in the clause of the constitution under consideration, and to give them that meaning involves no absurdity or contradiction with other clauses of the constitution. The prohibition is against becoming indebted,—that is, voluntarily incurring a legal

liability to pay, 'in any manner or for any purpose,' when a given amount of indebtedness has previously been incurred. It could hardly be probable that any two individuals of average intelligence could understand this language differently. It is clear and precise, and there is no reason to believe the convention did not intend what the words convey. A debt payable in the future is obviously no less a debt than if payable presently; and a debt payable upon a contingency, as, upon the happening of some event, such as the rendering of service or the delivery of property, etc., is some kind of a debt, and therefore within the prohibition. If a contract or undertaking contemplates, in any contingency, a liability to pay, when the contingency occurs the liability is absolute,—the debt exists,—and it differs from a present unqualified promise to pay only in the *manner* by which the indebtedness was incurred; and since the *purpose* of the debt is expressly excluded from consideration, it can make no difference whether the debt be for necessary current expenses or for something else."

It was again said in *Law* v. *People*, 87 Ill. 385, speaking of the same provision (p. 392): "The language of this clause is clear, explicit and emphatic that no city shall be allowed to become indebted, in any manner or for any purpose, beyond the prescribed limit. The city of Chicago was indebted beyond the limit when these certificates were issued, and if they, in any manner or for any purpose, create an additional indebtedness beyond that limit they are clearly prohibited. The language prescribing the limit is so plain as to admit of no doubt and forbids all construction, and the provision must be enforced as it is written." And also in *Culbertson* v. *City of Fulton*, 127 Ill. 30, we said (p. 36): "By entering into the contract on August 15, 1887, the city 'became indebted.' The obligations entered into by the terms of the contract constituted such an indebtedness as is contemplated by the language of the constitution. It cannot be said that the

indebtedness did not come into being until the work was completed and accepted by the city. The city bound itself to pay for the work when it should be completed, and could be compelled to do so if the work should be done according to the contract." The language in *City of Springfield* v. *Edwards, supra,* as to a debt payable in the future or upon a contingency, was cited and quoted.

It thus appears that this court has given effect to the language of the constitution in its plain and commonly accepted signification.

The question has frequently arisen whether a municipal corporation can incur an indebtedness in excess of five per cent of its taxable property for necessary supplies,—such as light and water. In *Prince* v. *City of Quincy,* 105 Ill. 138, the city had contracted with Prince to construct, maintain and keep in operation within the limits of the city a system of water-works, the city agreeing to pay him a certain sum per annum, in monthly installments, for the use of water for fire and other purposes, the contract to run for a period of thirty years, and if not renewed the city to purchase the works for a cash value. The works were constructed according to the contract and the agreement was observed by the parties for a number of years, when the city declined to further fulfill its terms upon the ground that the agreement had been entered into without legal authority on the part of the city, and so notified Prince. Thereupon he brought his action to recover damages for a failure on the part of the city to perform its part of the agreement. The city filed a plea setting up that at the time of making the agreement in suit it was, and had continued to be, otherwise indebted in an amount exceeding the constitutional limit. To this plea the plaintiff replied that the money sought to be recovered pertained to "the ordinary expenses of the defendant in the administration of the affairs and government of the city, and that at the time of the making of said contract the said several sums of money so provided to be paid

monthly by said defendant to said plaintiff, together with other ordinary expenses of the government of the said defendant, were within the limits of the current revenues of said defendant." In passing upon the sufficiency of the replication we said (p. 142): "While the provision of the constitution just cited declares, in emphatic terms, that a city or other municipality whose existing indebtedness already exceeds the constitutional limit, as was the case here, shall not become further indebted *'in any manner or for any purpose,'* it is seriously contended by counsel for appellant that a municipality thus circumstanced may become indebted for supplies to meet its ordinary wants and necessities. To so construe the constitution would be to add a provision, in the nature of an exception, to the constitution, which the framers of that instrument did not see proper to insert," (and this, it was held, could not be done,—citing the *Edwards case, supra.*) In a case between the same parties to the same contract, reported in the same volume, (p. 215,) it was held that a city having an indebtedness in the aggregate exceeding five per cent on the value of taxable property therein, while it so remains is powerless to create any debt at all, even for its ordinary or current expenses, and no contract of any municipality so situated, for the payment of money, can be enforced. To the same effect is *Prince* v. *City of Quincy,* 128 Ill. 443.

The contracts here involved were entered into in pursuance to an act of the legislature approved March 30, 1897, empowering cities of more than 100,000 inhabitants to make contracts for more than one year and not exceeding five years, relating to the collection and final disposition of garbage and ashes. They are identical in their terms, except as to parties and amounts. The contractors agree to furnish all labor, materials, lands, buildings, etc., to collect, remove and finally dispose of all ashes and garbage in the respective districts of the city for and during a period of five years from the date of the agree-

ments.   For the first district they were to receive $350,-
000; for the second $790,000; for the third, $349,312.50; for
the fourth, $384,500.    The agreement on the part of the
city to pay was as follows:

"The said city of Chicago hereby covenants and agrees,
in consideration of the covenants and agreements in this
contract specified to be kept and performed by the party
of the first part, to pay the party of the first part the sum
of . . . . . . dollars for removing all garbage, ashes, etc., from
the . . . . . . district, payable at the time and in the manner
prescribed in the specifications hereto attached: *Provided,
however*, that whenever any payment shall become due
to the said party of the first part, fifteen per cent of the
amount so becoming due shall be deducted and retained
by the city of Chicago until the termination of this con-
tract."

The time and manner of payment prescribed in the
specifications were, that, on the progress and perform-
ance of the work and the fulfillment of the conditions
of the contract being satisfactory to the commissioner of
public works, vouchers would be issued to the party of the
first part, divided and payable in equal monthly install-
ments for and during the term of such contract, reserv-
ing on each payment the sum of fifteen per cent until the
contract terminates.    Manifestly, unless the foregoing
decisions are overruled holding that a debt payable in
the future upon a contingency, such as the rendering of
services or the delivery of property, is a debt within the
prohibition of the constitution, there is no escape from
the conclusion that by these contracts the city incurred
an indebtedness.

Counsel for appellants cite the cases of *City of East
St. Louis* v. *East St. Louis Gas Light and Coke Co.* 98 Ill. 415,
and *City of Carlyle* v. *Carlyle Water, Light and Power Co.* 140
id. 445, as modifying the cases referred to.   Conceding that
there is language used in the opinion in the *East St. Louis
case*, and in the opinion of the Appellate Court cited in

the *Carlyle case,* which warrants the contention, it was not intended to have that effect.   Nor was the language so used necessary to the decision of either case.   They were each actions at law against the cities for services already rendered and accepted by the cities.   The attempt on the part of the cities was to defeat a recovery by setting up that the contracts were void because they incurred an indebtedness beyond the constitutional limit.   In both cases, at the time the contracts were entered into, the constitutional limit had not been reached, in the *East St. Louis case* by $20,000 and in the *Carlyle case* by nearly $12,-000.   The pleas in the former case do not appear in the opinion or statement of the case.   It is, however, stated (p. 429):  "It is insisted, further, that the city had no power to make the contract in question, because thereby an indebtedness was incurred in excess of the limitation fixed by section 12, article 9, of the constitution of this State.   *   *   *   It appears that the previous indebtedness of the city existing at the time this contract was made was $20,000 short of this constitutional limit.   Two hundred lamps,—the minimum number provided for by the contract,—at $35.20 per lamp per year, would amount to $7040 in a year, and to an aggregate for thirty years of $211,200.   Now, appellant's counsel contend that this aggregate sum of $211,200 should be considered as a present indebtedness,—as a debt incurred at the making of this contract on October 3, 1880.   We do not assent to the correctness of this view."   Then, after the language relied upon by counsel as holding that no present indebtedness was created by the contract, it is said:  "It appears that on February 1, 1877, the city was indebted $50,000 in excess of the constitutional limit.   This might have been, and yet the city in the subsequent months, at the times the gas sued for was furnished, may not have been indebted beyond the constitutional limit,—and this, without further noticing the point, we deem a sufficient answer to the objection made that the city, at the times

when the gas was furnished, was indebted beyond said limit. *Such a defense, in a case such as this, if it be one, must be strictly made out.*"

In the *Carlyle case* the constitutional limit had not been reached when the contract was entered into. The declaration, containing a special count setting up the contract and alleging performance on the part of the plaintiff, averred that the defendant, after the completion of the works, had used the same but wholly refused to pay the plaintiff as provided and agreed upon on its part. It also contained the common counts. By the pleas, which were held bad on demurrer, the city sought to annul the entire contract and escape payment for that which it had actually received and used by simply averring that it was indebted, at the time of entering into the contract, in the sum of $1000 and that the value of its taxable property was $256,740, and from these facts drew the conclusion that the debt existing against the city, together with the indebtedness created by said contract, exceeded the sum of five per cent of the assessed value of its property. In other words, the defense sought to be interposed by these pleas was upon the theory that the fact that the aggregate amount agreed to be paid, extending over twenty-one years, was larger than five per cent upon the taxable property of the city, would relieve it from the payment for the services actually rendered, whether the constitutional limit had been exceeded at the time such services were rendered and accepted or not. It was insisted, upon the argument, that the pleas did not answer the cause of action set up in the declaration, and that contention we sustained, citing the opinion of the Appellate Court and also the *East St. Louis case.* But we do not understand that thereby we adopted all of the language used in the opinion of the Appellate Court. It is, perhaps, true that the statement of the case (for which the writer of the opinion is alone responsible) was not as full as it should have been upon that branch of the case, and that the

sufficiency of the pleas was not as fully considered as it should have been.  That was, however, as plainly appears, a secondary consideration in the case, and we still think the conclusion clearly right.  But it cannot be fairly said that any intention is there shown to change the rule of construction as to the meaning of the words "to become indebted," as formerly decided.  That the *East St. Louis case* was not so understood by the court admits of no question.  As expressly stated in *Prince* v. *City of Quincy,* 105 Ill. 138, that opinion, so far as shown, was concurred in by the full bench, of which Justice SHELDON, who wrote the *East St. Louis case,* was then a member.  That which broadly distinguishes the *East St. Louis* and *Carlyle cases* from the *Prince case* and the one at bar is, that there the constitutional limit had not been reached when the contracts were entered into, nor did it appear that the sums sought to be recovered carried the indebtedness beyond that limit.  In these cases the whole contract was not void, but only so much of it as was in excess of five per cent upon the taxable property within the city limits.  The contracts were not of that indivisible character which would make it necessary to hold the entire contract void to defeat that part of it which was illegal, and therefore they were binding upon the city, in the one case to the extent of $20,000 and in the other to substantially $12,000.

In the case of *McPherson* v. *Foster,* 43 Iowa, 48, the constitutional provision being identical with section 12 of article 9 of our constitution, a school district had incurred an indebtedness of $15,000 when five per cent upon its taxable property amounted only to the sum of $2482, and a debt then existed against it to the amount of $425, and it was held that the contract to the amount of $2057.50 was good, the court saying:  "The independent district could become indebted to the extent of five per cent upon the amount of the last tax list.  Deducting existing indebtedness from such sum we find the amount of the

debt which it could contract was $2057.50. But it has at-
tempted to contract a debt of $15,000. We have seen that
for the excess over the prescribed limit no right of action
exists against the district. The question now arises, is
the district liable for the amount of the indebtedness
within the restricted limit? We think it is. As we have
seen, the constitutional inhibition operates upon the in-
debtedness,—not upon the form of the debt. The district
may become indebted to the amount of $2057.50 by bond.
If the debt exceeds that amount it is void as to the ex-
cess because of the inhibition upon the power of the dis-
trict to exceed the limit, and the bonds as to the sum in
excess are void because of the non-existence of a valid
debt therefor. But this restriction does not extend to
the sum of $2057.50, for which the district had power to
issue its bonds. The sum is a valid debt. The bonds to
that extent are valid." See *Daviess Co.* v. *Dickinson*, 117
U. S. 657.

In this view of the law, which is, we think, the correct
one and certainly reasonable and just, it is clear that the
aggregate amount of indebtedness extending over a pe-
riod of years could not be made the test of the validity
of the whole contract, because to do so would be to add
that which was illegal to that which was legal, in order
to defeat the whole contract,—and this was what was at-
tempted to be done in the *East St. Louis* and *Carlyle cases.*
In this case, according to the allegations of the bill, the
city of Chicago was, at the time of making the contract,
largely in debt beyond five per cent upon its taxable
property. In other words, it had reached the point where
it was compelled "to carry on its corporate operations,
while so indebted, upon the cash or pay-as-you-go plan,
and not upon credit to any extent or for any purpose."
(*Prince* v. *City of Quincy*, 128 Ill. 443.) In a case like this
it is wholly unimportant whether the aggregate indebt-
edness shall be considered or not. That the first monthly
installment at least became a debt within the prohibi-

tion, under the cases first above cited, cannot be denied, and to incur even that liability was a violation of the constitution.

This brings us to a consideration of the second question above stated, namely, was the city of Chicago, at the time of entering into these contracts, indebted beyond the constitutional limit. This question, as well as the foregoing one, seems to have received careful consideration by the chancellor, Judge Tuley, in his written opinion filed upon the final hearing, and he states and decides this point in the following language:

"Certain statements as to the city indebtedness were admitted in evidence by stipulation, from which it appears that the funded debt of the city was nominally, in round numbers, $17,000,000, and what is called the unfunded or floating debt $8,000,000. Five per cent upon the value of the taxable property, by the last assessment for State and county taxes within the city, would permit a city indebtedness, in round numbers, of $11,500,000. The bonded debt of the city known as the World's Fair debt, of $4,500,000, it is conceded should be deducted from the $17,000,000. This would leave $12,500,000 funded debt. In the funded debt is included what are called 'water loan bonds,' amounting to a little over $4,000,000. If these are deducted it would leave the funded debt about $8,300,000.

"Very ingenious and quite forcible arguments have been made on the contention that the water loan debt of over $4,000,000 should be deducted from the funded debt of the city. The bonds known as 'water loan bonds' are in all respects similar in form and tenor to the other bonds issued by the city except that they are designated 'water loan bonds,' and to all appearance an unqualified promise to pay. The contention is, without stopping to recite the different acts in relation to the water-works of the city of Chicago, that the water bonds are only payable out of a special fund known as the 'water fund,' and could not be paid by general taxation; therefore, that

they do not come within the spirit or reason of the constitutional prohibition, which, it is contended, is merely a prohibition against incurring indebtedness which is to be paid by general taxation. In the view which I take of this present city indebtedness it is not necessary to decide this question.

"A statement is presented as to the so-called floating indebtedness, amounting to $8,624,152. That statement is as follows:

*"Statement of all liabilities of the city, (bonded debt excluded,) and showing the floating debt or debt for which no provision has as yet been made as of date December 31, 1897, (practically the same on December 1, 1897):*

|  | Liabilities. | Cash Assets. |
|---|---|---|
|  |  | $2,742,328.53 |
| Coupons and interest outstanding...... ........ ........ | $231,282.29 |  |
| Judgments appropriated for............................ | 305,734.27 |  |
| Judgments not appropriated for................... ...... | 1,397,312.62 | 3,303,702.17 |
| Pension funds............................................. | 181,809.60 |  |
| Sinking funds ............................................ | 1,569,035.01 |  |
| Special funds............................................. | 890,433.27 |  |
| Taxes for street intersections............................ | 999,000.00 |  |
| Accounts payable, miscellaneous....................... | 687,855.78 |  |
| Time or revenue warrants......... ...................... | 2,361,690.08 |  |
| Total liabilities .............................. ...... | $8,624,152.92 |  |
| Less cash in treasury..................................... | 2,742,328.53 |  |
| Cash shortage,........................................ | $5,881,824.39 |  |
| Less uncollected taxes in course of collection applicable to the payment of these accounts.............. | 3,303,702.17 |  |
| Net or floating debt (not provided for)................. | $2,578,122 22 |  |
| Uncollected taxes of 1897 due city of Chicago app's.... |  |  |

"It will be seen from that statement that the admitted liabilities of over $8,000,000 are reduced by crediting cash in the treasury $2,742,328, and by crediting uncollected taxes in course of collection applicable to the payment of these liabilities, $3,303,702, leaving what is termed a net or floating debt of $2,578,122. Upon what principle it is contended that an outstanding debt is not a debt by reason of some cash in the public treasury it is difficult to perceive. As long as the cash is not applied to the payment of the debt the debt must remain. Nor can it be perceived upon what principle uncollected taxes in course of collection can be held to reduce the floating debt until they are actually collected and applied to its reduction.

"Ingenius argument is made that the judgments in tort against the city, amounting to $1,397,312, should not be included as a city debt. If a judgment is not a debt it is difficult to conceive what constitutes a debt.

"In the list of liabilities or floating debts which it has been contended should not be counted as a part of the city debt, there is this item: 'Time or revenue warrants, $2,361,690,' and this contention must prevail, because, under the decision of our Supreme Court, warrants issued upon taxes levied or in course of collection are taken by the party receiving the same in exchange for the debt.

"In my opinion the only other items about which any question could be raised as to whether they constituted indebtedness within the constitutional provisions are the two items of 'pension funds' and 'special funds,' amounting to about $1,000,000. But even excluding those, together with the time or revenue warrants, there is a city indebtedness, by reason of its admitted funded debt and its floating debt, beyond the constitutional limitation. The question is not one of insolvency, but solely one of indebtedness."

This clear and concise statement of the facts and law upon this branch of the case we regard as unanswerable. The conclusions are in harmony with the decisions of this court as announced in the *Edwards case*, and in *Fuller* v. *City of Chicago*, 89 Ill. 282.

We are also of the opinion that the water loan bonds issued by the city, amounting to $4,000,000, are an existing indebtedness against the city. Beginning in the year 1851 the city constructed a system of water-works, which has always been operated at a profit to the city; but instead of using that profit in liquidation of the indebtedness incurred in the construction of the system it has continued the extension of the same to meet the demands of the city, and at the time of making the contracts in question had incurred an indebtedness, represented by these bonds, to the amount of $4,000,000,—much less in

amount than the value of the system. While the purpose of managing the system so that it should be self-sustaining and not require general taxation to in any way support it has thus far been successfully carried out, yet the obligation of the city to pay the water bonds which were issued by it is absolute and unqualified; and if the water system should for any reason become worthless, or from its profits unable to liquidate those bonds, the city could be required to pay them, and, if necessary, raise the money by general taxation for that purpose. It seems to us that to hold that these bonds should not be included in the estimation of the city's indebtedness would be equivalent to saying the provision of the constitution limiting the power "to become indebted, in any manner or for any purpose, to an amount," etc., is meaningless. If the contention of counsel for appellants is correct as to these bonds not being an indebtedness against the city, then, notwithstanding this constitutional limitation, a city may embark in enterprises of this kind without limit and bond the municipality to the full extent of its credit. This certainly was not the intention of the framers of the constitution, nor can we conceive that the provision is susceptible of any such construction.

Our conclusion is that, as shown by this record, the city of Chicago was indebted, at the time of entering into these contracts, many millions of dollars beyond the limitation prescribed by the constitution; that by those contracts it attempted to incur an additional indebtedness which, for want of power under the constitution, it could not lawfully do. In this view of the case other questions raised and discussed become unimportant.

The decree below will be affirmed.

*Decree affirmed.*

CARTWRIGHT and PHILLIPS, JJ., dissenting.