IDA IRENE LAW *et al.*

*v.*

THE PEOPLE *ex rel.* Louis C. Huck, Collector, etc.

1. CONSTITUTION—*construction.* Courts are not justified in giving a strained construction or astute interpretation to a constitutional provision to avoid the intention of the framers of the instrument, or of a statute passed under it to carry out its mandate, in order to relieve against individual or local hardships. Their duty is to enforce them according to their plain and obvious meaning.

2. SAME—*when self-executing, without the aid of legislative enactment.* It is the settled doctrine that all negative or prohibitory provisions found in a constitution execute themselves, making void all acts done in violation of such provisions, the same as if in violation of express statutory law. And a statute creating a penalty for doing a thing forbidden by the constitution can add nothing to the invalidity of the act.

3. MUNICIPAL INDEBTEDNESS—*of the incidental power to create.* Municipal corporations being created for governmental, and not for commercial purposes, the power to borrow money or incur debts, is not an incident to their corporate existence, and can not be exercised unless conferred upon them by law, and a person loaning money to such corporations must see that the power exists.

4. SAME—*constitutional limitations.* Limitations imposed by the constitution on the power of municipal corporations to contract debts, should be construed with reference to existing facts, and with a view to the practical working of that instrument, and such a literal construction as would defeat the object to be attained should not be adopted.

5. Under the first clause of sec. 12, art. 9, of the constitution, municipal corporations are prohibited from incurring indebtedness, in any manner or for any

25—87 ILL.

| 87 | 385 |
|---|---|
| 26a | 457 |
| 26a | 458 |
| 26a | 460 |
| 87 | 385 |
| 124 | 664 |
| 125 | 567 |
| 87 | 385 |
| 28a | 504 |
| 28a | 507 |
| 87 | 385 |
| 128 | 458 |
| 87 | 385 |
| 33a | 580 |
| 87 | 385 |
| 133 | 493 |
| 87 | 385 |
| 36a | 58 |
| 87 | 385 |
| 161 | 145 |
| 52a | 433 |
| 87 | 385 |
| 47a | 483 |
| 87 | 385 |
| 56a | 125 |
| 87 | 385 |
| 63a | 216 |
| 87 | 385 |
| 165 | 24 |
| 87 | 385 |
| 89a | 175 |
| 87 | 385 |
| 176 | 408 |
| 87 | 385 |
| 178 | 307 |
| 87 | 385 |
| 186 | 10311 |
| 87 | 385 |
| d98a | 10450 |
| 87 | 385 |
| 105a | 2 48 |
| 87 | 385 |
| 205 | 22302 |
| 206 | 29360 |
| 109a | 10577 |
| 87 | 385 |
| 112a | 646 |

purpose, to an amount, including existing indebtedness, in the aggregate exceeding five per cent on the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes previous to the incurring of such indebtedness, and any corporate indebtedness created beyond such limit, and the evidences thereof, are void, and no tax can be levied and collected to pay the same or interest thereon.

6. The constitutional prohibition against the creation of municipal indebtedness beyond a certain amount, extends to and embraces debts incurred to be paid on a future day, as well as those due and payable at once.

7. SAME — *presumption as to validity of indebtedness created.* Where it is shown that evidences of indebtedness issued by a city are beyond and in excess of the constitutional limit, it will be presumed from that fact that they are prohibited and illegal. If it is possible for a city to create a valid and binding debt in excess of the constitutional limit, it must be shown that a debt created in excess of such limit is of such a character as the law sanctions, or it will be adjudged illegal and void. The burden of proof rests on the party asserting its validity.

8. SAME — *what constitutes corporate indebtedness.* Certificates issued by a city on which to procure "temporary loans," stating that the city owes the holder a specified sum of money, and promising, or directing the treasurer to pay it at a specified time, or otherwise, are evidences of indebtedness owing by the city. It is not essential to the existence of a debt that it shall be due at the time it is created.

9. SAME — *implied power to provide for current expenses.* Unless prohibited by positive law a municipal corporation may do all things fairly within the scope of the powers conferred, to accomplish the purposes for which it was created. Only general powers can be conferred upon such corporations, and from that source must be inferred all necessary power to render practicable that which is conferred by the general terms employed. Power to provide for the expense attendant upon the maintenance of municipal government is necessary to preserve its existence.

10. SAME — *anticipating taxes already levied but not collected, and of the mode of appropriating the same.* A municipal corporation which has reached the constitutional limit of its power to create indebtedness, may, when a tax is levied, but not yet collected, draw against the fund thus levied, and thus appropriate and virtually assign the amount specified in the warrant, and when collected the holder will have the right to receive it. But the corporation must be discharged, and the holder must look exclusively to the tax thus levied, and to the officers, for his pay.

11. When a corporation is thus situated and it hires labor or purchases materials, as it can incur no debt, it may, in thus hiring or purchasing, agree to transfer so much of the tax then levied as will pay for the same, and if the agreement is not so expressed in terms, the law will imply one to that effect.

12. When it is sought to apply the fund created by the levy of taxes, in anticipation of their collection, to meet lawful appropriations, contracts for that purpose payable exclusively out of such appropriations when the revenue shall be collected, are not regarded as contracting indebtedness. But the procuring of "temporary loans" by the corporation, which would be payable at all events, would be the creation of corporate indebtedness, and therefore, if in excess of the constitutional limit, not a permissible mode of anticipating such taxes.

13. Where a city has reached its constitutional limit of indebtedness, the following qualifications apply to further appropriations: 1. The tax appropriated must at the time be actually levied, and 2, by the legal effect of the contract between the corporation and the individual, made at the time of the appropriation and issuing and accepting an order on the treasury for its payment when the taxes are collected, must operate to prevent any liability on the contract against the corporation.

14. MUNICIPAL CORPORATIONS—*persons dealing with them must know the power exists.* Municipal corporations can only exercise such powers as are conferred upon them by their charters, and all persons dealing with them must see that they have the power to perform the proposed act.

15. When a city is expressly limited to a certain amount of indebtedness, beyond which no further debts can be created, a party loaning it money is bound to ascertain at his peril whether the city has not already reached its limit, and if he does not, and the city has reached its limit, he can not enforce payment of the evidences of indebtedness given him to secure the loan.

16. TAXATION *for municipal purposes—entertaining official visitors.* A municipal corporation has no authority to levy a tax to provide a fund with which to entertain official visitors to the municipality. Such a tax would not be for any necessary or proper corporate purpose.

17. SAME—*as to city of Chicago—effect of organizing under general law.* The sixth section of the general law relating to cities and villages, which provides that all laws and parts of laws, not inconsistent with the general law, shall continue in force and be applicable to any city or village adopting the general law, the same as though no change of organization had taken place, was intended to keep in force only laws conferring the usual and necessary corporate powers. It does not keep in force an amendment to the charter of the city of Chicago authorizing the levy of taxes for a fund to entertain official visitors.

18. SAME—*city tax to pay officers not known in charter—presumption.* Where a city council is empowered by general law, under which the city is acting, to provide by ordinance for the election or appointment of certain enumerated officers, and "such other officers as may by said council be deemed necessary or expedient," and a tax was levied by the city authorities to pay the expenses of the offices of assessor and tax commissioner, offices not named in the general law, it was *held,* it must be presumed in favor of the legality of the levy that

the city council had in some lawful way exercised its discretionary power in creating such offices, else the levy would not have been made.

19. SAME—*to pay a debt not authorized to be created.* When a city has issued evidences of indebtedness after having reached the constitutional limit as to amount, and the limit in its charter, in violation of the constitution and the law, such evidences being void, a tax levied to pay such certificates, or interest thereon, is illegal and can not be collected.

20. SAME—*of·the rule of assessment, as to uniformity, in respect to value.* It is made the duty of assessors, and of the State Board of Equalization, so far as charged with that duty, to assess all personal property at its "fair cash value," and all real estate at a "price it would bring at a fair voluntary sale," so that every person or corporation shall pay a tax in proportion to his or its.property.

21. The State Board of·Equalization found, by resolution, that the local assessors had assessed property at only fifty per cent of its actual value, and, after equalizing, assessed·the property of railroads and other private corporations on the same basis, instead of at its fair cash value, as the statute required: *Held,* that their action was proper, as obeying the constitutional mandate requiring uniformity, rather than the literal terms of the statute, and that it could work no injustice.

22. SAME—*assessment of railroad track as a whole.* What may be the relative value of the lands in the several counties over which a railroad track is laid, is not a pertinent inquiry in assessing the track, as such, for taxation. The track as a whole is a single property, and it should not be assessed upon any higher valuation per mile in one county than in another, even if its construction has cost more in some localities than in others. It is properly assessed as a whole, and this does not destroy uniformity in taxation.

23. SAME—*park taxes—upon what assessment.* The act relating to "Parks and Boulevards," requires park taxes to be levied upon "real and personal property within such town according to the assessment roll returned, for the purposes of State and county taxation, next preceding the estimate" authorized to be made. That portion of the revenue law which requires certain taxes to be extended upon valuations produced by the equalizations and assessments by the State Board of Equalization, does not include within it park taxes.

24. SAME—*application for judgment—irregularities.* Merely formal objections to municipal and other taxes should not be entertained where the irregularities complained of do not affect unjustly the interests of the citizen.

25. Mere irregularities that may intervene, either in making valuations, or in levying taxes, will not vitiate the tax, unless it is apparent such irregularities affect substantially the justice of the tax levied, or debar the citizen of some important right secured by law.

26. SAME — *amendments allowable.* On application for judgment against lands for taxes, all such amendments as could be made in personal actions, are allowable by statute, and any omission, or defective act of any officer connected

with the assessment or levying of the tax, in the discretion of the court, may be corrected, supplied and made to conform to law, either by the court, or by the person, in the presence of the court. by whose neglect or default the same was occasioned.

27. SAME—*judgment should be only for legal part.* Where a city ordinance for the levy of city taxes specified the several purposes for which the levy was to be made, and the sum required to be raised for each purpose, a part of which were illegal, the county court should render judgment for the amount legally levied, after deducting the illegal portion from the gross sum appearing against the several tracts and lots.

28. SAME—*practice—specific objections not made below.* It is a matter of grave doubt whether specific objections to the rendition of judgment against lands for taxes, not shown to have been made below, should be permitted to be urged in this court. If they are of such a character as could have been obviated by proof or amendment, they should be taken in the court below.

29. ORDINANCE—*description of council passing.* An ordinance will not be held void because in its title is used the words "common council," instead of the words "city council." The words are so nearly the same in meaning as to render it immaterial which are used.

30. SAME—*publication.* The publication of an ordinance with the proceedings of the city council adopting it, is a sufficient publication. It can make no difference whether it is published separately as an ordinance, or with the other proceedings of the corporation.

31. OFFICE—*right to, can not be questioned collaterally.* In a collateral proceeding, as, in a contest as to the validity of a tax sought to be collected to pay the expenses of certain offices, there is no warrant for declaring the incumbents were not rightfully exercising the functions of such offices, and entitled to receive the emoluments connected therewith.

APPEAL from the County Court of Cook county; the Hon. MARTIN R. M. WALLACE, Judge, presiding.

This was an application, by the treasurer and *ex officio* collector of revenue of Cook county, made at the July term, 1876, of the county court, for judgment for taxes against lands and lots alleged to be delinquent for the year 1875, and for back taxes and forfeitures to the State, together with interest and costs due and unpaid thereon. To that application defendants appeared, as objectors, for property described in the record, in which they allege they were severally interested. Their objections were overruled, judgment entered in the usual

form as prescribed in the statute, and it is upon their several appeals the cause is to be heard in this court.

Mr. JOHN BORDEN, Mr. JOHN P. WILSON, and Mr. EDWARD ROBY, for the appellants.

Mr. FRANCIS ADAMS, Mr. JOHN M. ROUNTREE, and Mr. CHARLES H. MORSE, for the appellees.

Mr. WILLIAM H. HOLDEN, for West Chicago Park Commissioners.

Mr. JUSTICE WALKER delivered the opinion of the Court:

It appears that the bonded indebtedness of the city of Chicago has, at all times since the adoption of our present constitution, been more than five per cent on the assessed value of the taxable property in the city, as ascertained for State and county taxation. And it further appears, that notwithstanding such bonded indebtedness, the city has each year, since 1872, if not previous to that time, issued certificates of indebtedness for temporary loans, bearing interest, intended to be paid out of the revenue levied for the current year, but not so stated in the certificates, and upon which money was loaned to and used by the city to meet its expenses.

On the 10th day of August, 1875, the city, by ordinance, in detail, levied various sums to meet the expenses of the various departments of the city government, aggregating the sum of $5,123,905.29, reciting that it was the total amount of appropriations previously made by the city to meet its expenses, in accordance with the law.

There are, amongst the items thus appropriated and levied, these: "For payment of interest on general bonded (municipal) debt of the city, and on temporary loans, in·addition to the unexpended balance of April 1, 1875, and to amounts for interest, $300,000." Another, "For entertaining official visitors, $2000." "For interest on temporary loans for this (water) fund, $40,000." "For interest on temporary loans for

fire department, $25,000." " For interest on temporary loans (police department), $25,000." These levies were made in pursuance of an ordinance adopted on the 30th of June, 1875, making the several appropriations for the purposes named.

There were outstanding certificates for temporary loans, issued after the constitution went into effect and on the first day of April, 1875, for the sum of $3,000,000, or more. On the 31st day of December, of that year, these certificates outstanding amounted to $4,500,000. The evidence shows the item of $300,000, appropriated and levied as before stated, was for interest on the bonded debt and on temporary loans then outstanding; for interest on the bonded debt the sum of $251,310 was required; and the remainder, $48,690, was to meet the interest on temporary loans. Thus, we see, there was levied for the payment of interest on temporary loans, by that ordinance, $138,690, which we understand to be in addition to an unexpended balance of a fund previously appropriated and levied to meet interest on these temporary loans.

It is insisted, that all of the first item levied to pay interest on temporary loans is unauthorized and void, and all of the other specified items, as above, were prohibited by the constitution from being levied; that the city was not only without power, but is expressly prohibited by the constitution and charter from making these loans, as the city was indebted beyond the constitutional limit when these temporary loans were made, to pay the interest on which this tax was levied; that these debts are illegal and void, and, being so, the city had no power to levy a tax to pay interest on a void debt, and the levy can not be enforced.

The constitutional provision supposed to be violated by the issuing of these certificates for temporary loans, is the first clause of the 12th section of art. 9, and is this : " No county, city, township, school district, or other municipal corporation, shall be allowed to become indebted, in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of

the taxable property therein, to be ascertained by the last assessment for State and county taxes previous to the incurring of such indebtedness."

The language of this clause is clear, explicit and emphatic, that no city shall be allowed to become indebted, in any manner or for any purpose, beyond the prescribed limit. The city of Chicago was indebted beyond the limit when these certificates were issued, and if they, in any manner or for any purpose, create an additional indebtedness beyond that limit, they are clearly prohibited. The language prescribing the limit is so plain as to admit of no doubt, and forbids all construction, and the provision must be enforced as it is written. When the intention of the framers of the constitution is ascertained, it must, as all will concede, be held paramount to all other powers in the State. It embodies the sovereign power of the State, by virtue of which, and by which alone, all legislative, executive and judicial power is exercised. It is the source to which all the departments of government, and all of its officers must ultimately look, to authorize or sanction their official acts. It not only confers, but it limits the exercise of governmental powers to the mode prescribed.

This prohibition was manifestly intended to limit the power of the General Assembly, municipalities and all others, in the creation of indebtedness by these bodies to the amount named, and they can not, either separately or conjointly, transcend that limit. It is the command of the supreme power of the State, and it must be obeyed. Nor is there lodged, in our form of government, in any department or functionary, any authority to dispense with this or other provisions of the fundamental law, or to mitigate its requirements.

It has also been repeatedly held, and is regarded as settled doctrine, that all negative or prohibitory clauses of this character found in a constitution execute themselves, as legislative provisions, in the same or other language, prohibiting the incurring of such indebtedness, could be no more binding or forcible than the constitution itself. But even if that were

possible, the city charter has prescribed the same limit to its power to create indebtedness, and in almost the same terms of the constitution. (Rev. Stat. 1874, p. 218, sec. 62.) If the General Assembly were to impose a penalty for the violation of this prohibition, that would add nothing to the invalidity of the act. If that body were to add a sanction to this violation of the prohibition, by imposing penalties and forfeitures on those who should violate this provision, that could not lend the slightest force to the prohibition. Such an enactment might deter officers from violating this section, but it could accomplish no more.

Did these certificates, issued to procure temporary loans of money, in any manner or for any purpose, create an indebtedness? When issued, negotiated and delivered, did they purport to become debts? They have all of the essential forms of evidences of indebtedness, and that they purport to create indebtedness seems to be so plain a proposition, that we are at a loss to know how to discuss it or to render it more manifest, than by the mere statement of the proposition. We apprehend, these certificates, stating that the city owes the holder a specified sum of money, and promising to or directing the treasurer to pay it at a specified time, or otherwise, are debts, according to the definition of the word as given by any English dictionary, and we apprehend, among the people, no one, according to the general understanding of the word, would say they are not evidences of indebtedness owing by the city. And if this is the generally accepted meaning of the word, as we think all must concede, then, according to the canons of interpretation, we must presume it was used in that sense by the framers of the fundamental law, unless it is apparent, from the instrument itself, that the word was intended to be used in a different sense. No such intention appears, when the entire section and article are examined. The framers of the article could not have used the term in the sense that the sum must be due, to be indebtedness, as that is not the generally received meaning of the word, and to apply such a

meaning would remove all limit on the amount of indebtedness that might be incurred, except the extent of the credit of the municipality. Such debts are usually created on time, and if such are not prohibited, then, if persons could be found to purchase such paper, the indebtedness could be increased even beyond the value of all the property in the city. Hence, such could not have been the meaning attached to the language by those who adopted the provision, and for us to apply such a strained meaning to the word, would defeat the obvious purpose of the convention and the people who adopted the constitution thus framed.

It is said, that to so hold will work great hardship and injustice on the holders of these certificates of indebtedness. The same may be frequently said of any other persons who violate the law, or act contrary to its provisions. The persons loaning this money did it in the face of this constitutional provision, and the prohibition contained in the 62d section of the charter. The law is, and all persons are presumed to know it, that municipal bodies can only exercise such powers as are conferred upon them by their charters, and all persons dealing with them must see that the body has power to perform the proposed act. Such corporations are created for governmental and not for commercial purposes. Hence, power to borrow money or create indebtedness is not an incident to such local governments, and the power can not be exercised unless it is conferred by their charter, and no one has the right to presume the existence of such a power, and persons proposing to loan money to these bodies must see that the power exists. If the holders of these certificates omitted to learn whether there was power, or that it was exhausted, when they loaned their money, it is their misfortune. The constitutional and charter prohibitions are so plain, that any ordinary business man could not have misunderstood their meaning, and the question whether the city had reached the limit, had only to have been asked of those negotiating the certificates, to have learned that it had. The means of acquiring information,

full and complete, were at hand, and were entirely accessible to the lender, before and at the time of loaning his money, and he should have used them to protect his interest.

But, should it work hardship to individuals, that by no means warrants the violation of a plain and emphatic provision of the constitution. The liberty of the citizen, and his security in all his rights, in a large degree depend upon a rigid adherence to the provisions of the constitution and the laws, and their faithful performance. If courts, to avoid hardships, may disregard and refuse to enforce their provisions, then the security of the citizen is imperiled. Then the will, it may be the unbridled will, of the judge, would usurp the place of the constitution and the laws, and the violation of one provision is liable to speedily become a precedent for another, perhaps more flagrant, until all constitutional and legal barriers are destroyed, and none are secure in their rights. Nor are we justified in resorting to strained construction or astute interpretation, to avoid the intention of the framers of the constitution, or the statutes adopted under it, even to relieve against individual or local hardships. If unwise or hard in their operation, the power that adopted can repeal or amend, and remove the inconvenience. The power to do so has been wisely withheld from the courts, their functions only being to enforce the laws as they find them enacted.

Nor is there any force in the consideration that to enforce these provisions will occasion inconvenience to the city officials in administering its governmental affairs. It is true, they can, as all must know, only exercise the powers conferred by the charter, in the mode prescribed therein, by their ordinances. Neither a city nor any of its officers has any inherent power in governing it, but all of their powers are delegated and limited by the charter and ordinances adopted in pursuance thereof, and to carry such delegated powers into effect; and the question with us and the city authorities is, not what would be the most suitable powers to be conferred, but what have been granted. The people, through their representatives,

are the sole judges of what power shall be granted, what with-held, and what shall be expressly prohibited from being exercised by such bodies, and when their will has been legally expressed it must be obeyed by courts and municipalities, in its full spirit and meaning. The provisions of the constitution and charter must be enforced, although it may occasion incon-. venience in conforming to their requirements.

The members of the convention, after using the broad and comprehensive language of the first clause of the section, seem to have supposed that it would prevent the incurring of every species of indebtedness beyond the limit, whether inchoate or completely consummated, hence they excepted from its operation the issuing of bonds that had been legally voted, but not issued, by municipal bodies, to aid in the construction of railroads. Had they not supposed they would be prohibited by that clause, why expressly relieve them from the restriction? The vote to issue such bonds, surely, has less resemblance of indebtedness than these certificates. If indebtedness at all, they are but inchoate and incomplete, whilst these certificates have all the forms of legal indebtedness. This lends force to the conclusion, that the first clause was intended to embrace indebtedness of every description, nature and kind, and in every sense of the term, whatever the character or form by which it was evidenced, when made or issued after the limit should be reached.

The clear and unmistakable purpose of the framers of the organic law, by inserting this provision, was to effectually protect persons residing in municipalities from the abuse of their credit, and the consequent oppression of burthen-some, if not ruinous, taxation. There could, we think, have been no other purpose, and this is made manifest from the experience of the past. Under the constitution of 1818 there was no limit on the power of the General Assembly to borrow money on the credit of the State, or to authorize municipal bodies to incur indebtedness. Under that constitution, the General Assembly entered upon a gigantic system of internal

improvements, paid for by money borrowed by the State; but it ended in bankrupting the State, and almost in ruin of its citizens. Whilst laboring under the disastrous effects of that policy, the convention convened that framed the constitution of 1848, and they inserted, as a part of that instrument, the 37th section of article 4, by which the power of the State to incur indebtedness was limited to $50,000, except to repel invasion, suppress insurrection or defend the State in war, or when the people should vote to create a debt.

In the judgment of that convention, the provision was necessary to protect the people from the disastrous results of reckless indebtedness. The experience of the past, with its financial disasters, and the insupportable burthens it entailed on the people, rendered such a limitation necessary. But previous to that time, the General Assembly had granted the power to municipal bodies to become indebted, with caution, and the necessity to place them under similar restrictions had not become manifest, and no provision was then inserted to limit the power of the legislature to authorize such debts to be incurred. When, however, the convention of 1870 assembled, the abuse of municipal credit, under legislative authority, had become so manifest, and the necessity for its restriction so apparent, that it was supposed to be wise to apply a restriction to such bodies as well as to the State. Hence the insertion of section 18, article 4, of our present constitution, and the section under consideration.

No inconvenience has been experienced by the State, under this restriction, but, on the contrary, for nearly a third of a century, we have had an almost unprecedented career of prosperity. We have grown vastly in population, in wealth and material greatness. The State has, under the restriction, paid a vast debt, with its interest, and paid all of its expenses, and no valid reason is perceived why the great municipality of Chicago, under the same prudence, economy and financial ability, should not be able to manage its financial affairs with like results. It has the same revenue system as the State. Its

taxes are assessed, levied and collected in the same manner and at the same time. Nor are we aware that any county or other municipality in the State has suffered any embarrassment by reason of the same restriction on their credit. But if the revenue system is defective, or needs amendment, the wisdom of the General Assembly will, no doubt, apply the corrective. Seeing the salutary effects of the restriction, as applied to the State, we must conclude it will, if strictly adhered to, produce equally beneficial results in counties, cities and other municipal corporations, and such was, no doubt, the belief of the convention.

These certificates, then, being evidences of indebtedness, and the city, at the time and before they were issued, having reached the limit of its power to incur debts, in any manner or for any purpose, they were not only unauthorized, but were prohibited by both the constitution and the charter, and it follows the city had no power to make any appropriation or levy a tax to pay interest on them. The certificates having been issued and the debt contracted in direct violation of law, they were void, and the debt being void, the interest must be equally void, and the levy of the tax to pay it is as effectually prohibited as to incur or pay the principal debt. The interest is as much a debt as the principal on which it accrues, and can be no more lawful or binding. It then follows that the appropriation, and levy of this tax to pay interest on these temporary loans, were void, and have no legal force.

But it is claimed that this is but anticipating the revenue already levied and to be collected, and these loans are, therefore, not indebtedness. They purport to bind the city, and if it was not for the prohibition, the city could be sued on them, and a recovery had, because they are debts. They are not drawn, so far as we can see, against the revenue or tax levied for any particular year, nor do they state that they can be paid only out of that particular tax or fund. When these debts were contracted, the city officials, no doubt, expected them to be paid out of the fund levied for the purpose, and if not,

then out of some other fund, either then or afterwards to be levied and collected, and the lender expected to receive his money, without regard to the source from whence it came.

This is not an anticipation of revenue provided; it is issuing certificates of indebtedness, attempting to bind the city for their payment.

In the case of *The City of Springfield* v. *Edwards*, 84 Ill. 626, we pointed out the manner in which revenue already levied and to be collected might be anticipated without the city becoming indebted, or violating the constitutional or statutory prohibition, and the questions presented by this record are essentially the same as in that, and must be governed by that case. In that case it was held that the tax upon which the warrant is drawn must at the time be actually levied, and the delivery of the warrant on the treasury must have the legal effect and operate as a contract between the corporation and the person receiving the warrant, that the city shall thereby incur no liability whatever. In such a case there is no debt incurred, because the warrant on the treasurer is received for the work done or the articles furnished. The one thing is given and received for the other, and the transaction closed on the part of the city, leaving no future obligation, either absolute or contingent, upon it, whereby its debts are increased. "But until a tax is levied, there is nothing in existence to be exchanged; and an obligation to levy a tax in the future for the benefit of a particular individual, necessarily implies the existence of a present debt in favor of the individual, against the corporation, which he is lawfully entitled to have paid by the levy. If the making of the appropriation and issuing and accepting a warrant for its payment does not have the effect of relieving the corporation of all liability, or, in other words, if it incurs any liability thereby, it must, manifestly, incur, either absolutely or contingently, a debt. Where a warrant or order, payable from a specific appropriation of a tax levied but not yet collected, is accepted in exchange for services rendered or to be rendered, or for materials furnished

or to be furnished, so that there is, in fact, the exchange of one thing for another, the duty remains for the proper officers to collect and pay over the tax in accordance with the appropriation—but obviously, for any failure in that regard, the remedy must be against the officers, and not against the corporation, for, otherwise, a contingent debt would in this way be incurred by the corporation."

The theory is, that a corporation which has reached the constitutional limit of its power to create indebtedness, may, when a tax is levied, but not collected, draw against the fund thus levied and provided, although not in the treasury, and thus appropriate and virtually assign the amount specified in the warrant on the treasury, to the person to whom it is issued and delivered, and that amount, being assigned or set apart to him, when collected he has the right to receive, and it becomes the duty of the officers to collect and pay it to him; and failing in their duty, he would have an action against them for its recovery. But with a corporation thus situated, the legal effect of the issuing and receiving of the warrant is, that the person receiving an assignment or appropriation of so much of the specific tax already levied, and against which the warrant is drawn, by receiving it, discharges the corporation from all liability on account of the services or articles for which it is drawn, and agrees to look to the tax thus levied and appropriated, and to the officers, for his pay, and he thereby discharges the corporation from any and every kind of liability therefor. In such a case the warrant is given and received in full satisfaction for the services rendered or the material furnished.

Where a corporation is thus situated, and it hires labor or purchases material, as it can incur no debt, it may, in thus hiring or purchasing, agree to thus transfer so much of the tax then levied as will pay for the same, to the person performing labor or furnishing material. And in case a corporation was so situated, and the agreement was not so expressed in terms, the law would imply such an agreement, and not that

the corporation, having no power to create a debt, could be sued and a recovery had on such a contract.

Officers rendering services, and persons furnishing articles of property to the State, know that it can not be sued and a recovery had, and yet the State experiences no difficulty in procuring all of either· that is desired. When either are furnished, on adjusting the account, the Auditor of Public Accounts draws his warrant on the Treasurer for its payment, and if the taxes have been collected, and the money is in the treasury belonging to the fund against which the warrant is drawn, the Treasurer pays it, but if not, the person owning the warrant holds it until the funds are collected and are in the treasury for its payment. Nor do these warrants draw interest, and yet, so far as our knowledge extends, most persons are willing, if not anxious, to serve the State, or furnish it with articles it may need; and this, too, notwithstanding the State is prohibited from borrowing but a limited sum of money, and incurs no legal liability by drawing such warrants. Then why may not the great, populous and wealthy city of Chicago, containing, as it does, great financial ability, with the same laws for collecting revenue, produce the same results? We are unwilling to believe it can not be done.

If, under the language of this provision of the constitution and the charter, it could be possible for a city, after it has reached the limit, to create a further debt, still it is not shown that these certificates are of that character. And when it is shown that they are beyond the limit, we must presume, from that fact, that they are prohibited by these provisions. The prescribed limit is shown to have been more than reached before they were issued, and the transaction, on its face, falls within the prohibition, and in the ·absence of evidence that they grew out of a transaction sanctioning their issue, if such can exist, they must be held void. To hold otherwise would place the burthen of proving that unlawful which both the constitution and charter have expressly prohibited, upon the person objecting to their validity. Being prohibited in general

26—87 ILL.

terms, if they fall within any exception, it is for the holder to show it, and not the tax-payer. We have, in the light of the able and exhaustive arguments filed in this case, reviewed the case of *Springfield* v. *Edwards, supra,* but are unable to change or modify the views there expressed. We are satisfied we announced the rule as it is imperatively required by both the language and spirit of the constitution and the charter, and we must adhere to that decision.

It is not claimed that the general law, under which the city is acting, confers power to levy a tax to provide a fund to entertain official visitors of the city, but it is contended that the amendment to the former charter, approved the 9th of March, 1867, (Private Laws, vol. 1, p. 771,) does, in terms, confer the power; and inasmuch as that provision is not repugnant to the present charter, by force of the sixth section of the general law the power may be lawfully exercised. That section provides that all laws and parts of laws not inconsistent with the general law, shall continue in force and be applicable to any city or village adopting the general law, the same as though the change of organization had not taken place. Is, then, that amendment continued in force ? We, from the language employed, can only suppose that all laws and parts of laws conferring ordinary corporate powers were intended to be preserved, and not such as were unusual or extra corporate powers. This power, it is believed, is seldom conferred on municipalities, and, in the very nature of things, can not be held a necessary or proper corporate power. We are at a loss to perceive in what manner its exercise can be conducive to the well being of the inhabitants of the city, or it could in the slightest degree advance their prosperity, or protect them in any of their rights, or promote and advance morality or good order.

The 62d section of the general law is full and explicit in conferring powers on the city, and this is not of the number. And even if the sixth section is not in conflict with the constitution, we must hold that it only intended to keep in force

laws conferring the usual and necessary corporate powers; and this amendment is not of that character. We are, therefore, of opinion the amendment of the previous charter is inconsistent with the present charter, and the tax was not legally levied to provide this fund.

It is urged, against the validity of the entire city tax, that the ordinance making the various appropriations for the fiscal year is void, because in its title is used the word "common," instead of the word "city" council, as required by the present charter. At the time this ordinance was adopted, no election had been held after the adoption of the present charter, and the councilmen elected under the old charter were still performing the duties devolved on the legislative department of the city government, and it may be that body was still the common council, until new aldermen were elected, and if so, the title was strictly accurate. But be that as it may, the two terms are so nearly precisely the same in meaning, that we regard it immaterial which term was used in such an ordinance. Even if the word "city" should, technically, have been used, the adoption of the words "common council" would not be ground for holding the ordinance void.

The other questions presented by the record and not here considered are fully discussed by my brother SCOTT, and I therefore refrain from their discussion.

As to all but the city taxes, we perceive no error in the judgment, and it is to that extent affirmed. But for the errors indicated in the city tax, the judgment as to them is reversed, and the cause remanded, that the court below may render judgment for the amount of that tax legally levied, after deducting the illegal portions from the gross sums appearing against the several tracts or lots of ground.

*Judgment affirmed in part and reversed in part.*

Mr. Justice Scott:

Involved in this litigation are State and county taxes, city taxes, town and park taxes, and special taxes imposed for local improvements, and levied by virtue of different corporate authorities, under the sanction of numerous acts of the General Assembly. The discussion has assumed a wide range, and embraces a great number of matters which, it is insisted, affect fatally the validity of the taxes for which judgment is sought against lands in which contestants allege they had an interest, some going to the whole tax and others only to parts or particular taxes, but it is not deemed necessary to consider any except such as are relied upon in argument.

An objection urged is, the valuation upon which the taxes were extended was void, because it was the result of the illegal action of the State Board of Equalization, and being void, under the doctrine laid down in *Town of Lebanon* v. *Ohio and Mississippi Railway Co.* 77 Ill. 539, the taxes extended thereon are also void. That which is said to render the action of the State board illegal is, they first ascertained that all property in the State, both real and personal, had been assessed for the year the taxes were extended at fifty per cent of its cash value, and then proceeded to assess for taxation property of railroad and other private corporations, at the same proportion of its cash value.

Under our constitution, all needful revenue shall be levied by a tax on the valuation, so that every person or corporation shall pay a tax in proportion to his or its property. Whatever rules may be adopted to carry out this provision of the constitution, should be with a view to produce that result. Accordingly, it is made the duty of assessors, and the State Board of Equalization, so far as it is charged ,with that duty, to assess all personal property at its "fair cash value," and all real estate at a "price it would bring at a fair, voluntary sale." However desirable it may be that all assessments should be made on that basis, it is known such a result has

never yet been reached. When the State board came together, their first duty was, to ascertain, as nearly as practicable, on what basis the valuations of both real and personal property had been made. That was indispensable to any just equalization of values. They found all valuations of real and personal property had, in fact, been made on a basis of fifty per cent of its cash value, and expressed their finding in a resolution adopted. Had the board resolved all property in the State had been assessed at its fair cash value by the local officers, for taxation, it would not have changed the actual fact with which the board had to deal. Common honesty required the board to declare the exact truth, as we have no doubt was done, from the best information attainable. It was a fact within their jurisdiction to find, and if fairly done, and from the most reliable information in their possession, we are not aware such a finding can be reviewed by any court or by any tribunal.

It will be conceded the statute makes it the duty of the State board to assess corporate property at its fair cash value. Previous decisions of this court so declare the rule. *Porter* v. *Rockford, Rock Island and St. Louis Railroad* Co. 76 Ill. 561; *Chicago, Burlington and Quincy Railroad Co.* v. *Cole*, 75 Ill. 591. No omission of that duty is shown. As we understand the record, the State board did estimate the fair cash value of all that class of property which the law made it their duty to do, and their action in that respect is not called into question. As we have seen, all other property in the State had been assessed at one-half its cash value. Under the law, the State board had no power to increase the aggregate valuation beyond one per cent on such aggregate assessed valuation. It became a question, what was to be done? Whatever may be the statutory injunction as to making valuations of property for taxation, the controlling authority as contained in the constitution is, it shall be so valued that every person and corporation shall pay a tax in proportion to his or its property. Under the circumstances, had the State board set down the property of corporations at its fair cash value, as ascertained for the pur-

pose of taxation, then such property would have been subjected to an increased taxation in proportion to property of other owners, which the constitution positively inhibits. Observing the constitutional injunction, rather than a literal compliance with the statute, the State board equalized the valuations of that class of property at the same ratio adopted by local officers in fixing valuations of other property in their several localities. Any other rule would have been most unjust as well as in contravention of the constitution. Under the rule adopted, every person and corporation is made to pay a tax in proportion to the value of his or its property. It was the only rule that could have been adopted to secure anything like uniformity in valuations for taxation. A strict observance of the statute, in that respect, would have worked manifest injustice, as well as a plain violation of that constitutional requirement, that the burden of taxation should be made to bear equally upon all property, whether owned by private persons or by corporations. That which the constitution imposed was the higher duty, and the State board was not at liberty to disregard its provisions. This view of the law is sanctioned in *Bureau County* v. *Chicago, Burlington and Quincy Railroad Co.* 44 Ill. 229.

It was obligatory upon the State board to equalize valuations of property under the law, as the same had been certified by the local officers making the same, and it is difficult to appreciate the argument, the State board had no authority to equalize the valuations of property on the basis of fifty per cent of its cash value. What possible difference could it make whether the State board regarded the valuations of property made by local assessors as having been made upon a basis of fifty per cent, or upon its fair cash value? In either case it was the duty of the State board to equalize the valuations as they came before them. Great difficulty has always been experienced in arriving at just valuations of property for taxation, and, as yet, no great accuracy has ever been attained; but it has never been understood, every inequality in that respect

would vitiate the whole assessment.    Should entire uniformity and accuracy in valuations of property for revenue purposes be exacted, it would be impossible to collect either State or municipal taxes.    *Bureau County* v. *Chicago, Burlington and Quincy Railroad Co.* 44 Ill. 229; *Chicago and Northwestern Railway Co.* v. *Boone County*, 44 Ill. 240.

Among the taxes contested is one levied upon property in the city of Chicago, to meet an appropriation made by ordinance to pay interest on what are termed "temporary loans," and that, it is said, is illegal.    It may be assumed, as proven, the appropriations made were for the payment of interest on "temporary loans" for the fiscal year from April 1, 1875, to April 1, 1876, and being the fiscal year for which the taxes contested were levied.    The controller is positive in his statement, the appropriation ordinance contains no appropriation for interest on "temporary loans" prior to that date.    Elaborate arguments have been made on this branch of the case, and the difficult questions raised have been the subject of much discussion and reflection on the part of the court.

The restriction upon the power of municipalities to contract indebtedness is contained in the first clause of section 12, article 9, of the constitution: "No county, city, township, school district, or other municipal corporation, shall be allowed to become indebted, in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes previous to the incurring of such indebtedness."    Prior to the adoption of the present constitution, the funded debt of the city of Chicago exceeded the limitation fixed by that instrument, and has not since been reduced.    There is, also, what is called a "floating indebtedness," of many thousand dollars, in addition to the bonded indebtedness, much of which, if not all, has been contracted since the adoption of the constitution; but the amount of that indebtedness, and

when contracted, are not, in my view, matters that affect the decision of the questions made.

The direct question comes up for decision, can a municipal corporation, the indebtedness of which exceeds the constitutional limitation, anticipate the taxes levied for any current year, so as to make them available for that fiscal year? Limitations imposed by the constitution, in such matters as we are considering, should be construed with reference to existing facts, and with a view to the practical working of that instrument. Such literal construction should not be adopted as would defeat the object to be attained. It was, no doubt, the purpose in framing the constitution to afford protection to municipal corporations. They constitute efficient aid to government, that can not well be dispensed with. Self-preservation is a right inherent in everything capable of exercising it, and may be said to pertain to artificial as well as natural persons. Unless prohibited by positive law, a municipal corporation may do all things, fairly within the scope of powers conferred, to accomplish the purposes for which it was created. Only general powers can be conferred upon municipal corporations, and from that source must be inferred all necessary power to render practicable that which is conferred by the general terms employed. Express authority is given to do many things for the protection of the life and property of the citizen, and with that grant of power must necessarily be connected authority to provide for the expenses attendant upon the maintenance of municipal government; otherwise, the grant of power, however comprehensive, would be valueless and unavailing. The taxes levied for any year should be for the expenses of that fiscal year. Unless such taxes can be anticipated in some mode, it is not practicable to make them available for that purpose. It is a matter of which courts must take judicial notice, that taxes levied for any one year are seldom, if ever, all collected within that fiscal year. Accordingly, when appropriations for ordinary expenses have been made, and taxes levied to meet the same, the revenue so

appropriated, in legal contemplation, is regarded as already in the treasury of the corporation imposing such taxes. The principle is, that when taxes have been levied to meet lawful appropriations, the corporate authorities may proceed with the expenditure of such funds for the purposes for which the levies were made, in anticipation of their collection. This view of the law has been distinctly recognized by this court in *Newell's case,* 80 Ill. 592. Other courts, where the constitutions of the States contain provisions similar, if not identical with our own, as to limitations upon contracting municipal indebtedness, have reached the same conclusions. *Grant* v. *City of Davenport,* 36 Iowa, 396; *People* v. *Pacheco,* 27 Cal. 175; *State* v. *Maberry,* 7 Ohio State R. 522; *Reynolds* v. *Mayor,* 13 La. Ann. 426. Appropriations for ordinary municipal expenses may be made in anticipation of taxes levied in any year, and contracts payable out of such appropriations when the revenue shall be collected, is not regarded, in any just sense, as contracting indebtedness by the corporation. The revenue has already been provided and set apart for a specific purpose, and, in contemplation of law, it is in the treasury of the corporation. It is obvious, therefore, if the appropriations do not exceed the taxes levied for payment of the same, no additional corporate indebtedness is created.

Assuming, as I do, the proposition, a municipal corporation may appropriate its revenues in anticipation of their receipt, as effectually as when actually in its treasury, may be maintained both on principle and authority, the question recurs, what is the most feasible mode of anticipating such taxes?— and no better plan suggests itself than by " temporary loans." It has for its support considerations of convenience and economy. It is not practicable to agree with persons in the service of the corporation, in the various departments, to wait for their wages until the revenues for the year in which the services were rendered have been collected. That might, in many instances, be beyond the term of their employment. An insuperable objection to that mode of defraying all ordinary

expenses for any year out of the revenue of that year, is, the taxes so levied are not all collected within the fiscal year in which the services were rendered. No prudent man would undertake to manage his private affairs in that way. Implied in the power to make such "temporary loans" in anticipation of taxes levied, is the authority to pay interest on the same as an incident to the principal thing done. One is as lawful as the other. *City of Galena* v. *Corwith,* 48 Ill. 423.

But the question of most seeming difficulty is, whether "temporary loans," effected with a view to anticipate the revenue of any fiscal year, is contracting municipal indebtedness, in the sense that term is used in the constitution. I am of opinion it is not. Both principal and interest of such "temporary loans" are payable out of the revenues for the fiscal year for which they were made. It can make no possible difference, in a legal point of view, whether the revenues for any fiscal year are anticipated in this mode to raise funds for immediate use with which to defray ordinary expenses for which appropriations have been made, or whether it is done by contracts with persons in the service of the corporation to wait for their wages until the revenues of that particular year, as a matter of fact, come into the treasury. The former would be a practical and economical way of anticipating such revenues, while the latter would involve the necessity of paying increased wages for everything done for the corporation, which would be equivalent to a discount of the usual rate of interest for that period, if not greatly in excess of it. The cases cited, *supra,* sustain the view of the law we have taken. The same cases were cited by this court in *The City of Springfield* v. *Edwards,* 84 Ill. 626, and the rule recognized in them was assented to by the members of the court concurring in that opinion, with two qualifications: first, the tax appropriated must, at the time, be actually levied; and second, by the legal effect of the contract between the corporation and the individual, made at the time of the appropriation, and issuing and accepting an order on the treasury for its payment when col-

lected, must operate to prevent any liability on the contract against the corporation. It was there said, the principle is, there is in such cases no debt, because one thing is simply given and accepted in exchange for another. That is the precise case presented by this record. All "temporary loans" for which appropriations for the payment of interest were made, were obtained after the 1st day of April, 1875, and, so far as we can know, both principal and interest were specifically made payable out of the revenue of that fiscal year. No proof is made to the contrary, and no presumptions will be indulged they will not be paid in that way. Sufficient appropriations were made for that distinct purpose, and, in the absence of proof, it must be understood that which the law requires the municipal officers to do will be done.

Whether there are "temporary loans," that were contracted in previous years, that constitute municipal indebtedness, and therefore invalid, because inhibited by the constitution, is a question not before us, nor does it in any way affect the present decision, and for that reason I forbear to remark upon it.

The point is made, the Revenue act, in that provision which requires the State Board of Equalization to "value railroad track" and divide the aggregate between the several counties and other municipalities, in proportion to the length situated therein, violates the rule of uniformity which the constitution requires shall be observed in valuations of property for taxation. The reason assigned is, it deprives counties, towns and cities of the value of this class of property situated within their limits as a basis for local taxation. As the taxes in this case were levied on the basis indicated, it is said that all taxes, except State taxes, are alike unequal and void, because the law fixes a basis of assessment forbidden by the constitution.

The fallacy of this argument is, it rejects the definition given by this court in *Porter* v. *Rockford, Rock Island and St. Louis Railroad Co.* 76 Ill. 561, of this class of property, that a railroad and its equipments "constitute a single, entire property." As was said in that case, "the cost of construction in any par-

ticular town or county affords no criterion of the value of that portion of the road, for every mile of the road is equally indispensable to its existence as a whole, and contributes proportionally to its principal earnings." It may be that in centres of traffic a limited number of feet, or rods, of a railroad may earn, by way of rent from other companies, a large percentage on its cost, exceeding the proportion earned by the balance of the road in its ordinary and legitimate business; but it is apprehended such increased earnings are due to the fact such companies have extended lines that bring the products and trade of a wide expanse of country over them, and but for such extended lines crowding business into great centres, no such rents could be realized. It is in that way every mile of the road, whether in one county or another, without reference to its actual cost in any locality,—whether laid with steel or iron rails, or over land worth much or little, measured by acreage,—" contributes proportionally to its principal earnings." What may be the relative value of lands in the several counties over which the track is laid, is not a pertinent inquiry in assessing the value of the *track* as *such*. Its use by the railroad company is exclusive for a single, definite purpose, and it is worth no more in one locality than another for roadbed. Keeping in view the fact a railroad and its equipments must be regarded for most, if not all, purposes "as a unit," or as constituting a "single, entire property," the mode prescribed in the statute for assessing it for taxation is one that best observes that rule of uniformity which the constitution enjoins.

The *State Railroad Tax Cases*, 2 Otto, 575, arose under the laws of Illinois, in which the precise point was made as in that case, that "the railroad track, capital stock and franchise is not assessed in each county where it lies, according to its value there, but according to an aggregate value of the whole, in which the county, city and town collects taxes according to the length of the track within its limits," and, in a well

reasoned opinion, this provision of our Revenue act was sustained.

Among appropriations made was one making provision for the expenses of the offices of assessor and tax commissioner within the city of Chicago, and objection is urged against the tax levied to pay the same, on the ground there could be no such officers in that city under the General Incorporation act. The city became incorporated, under the general law, April 23, 1875, and on the 3d day of May, 1875, the city council, by ordinance, declared all municipal officers in office at that date should continue in office, and exercise the same powers and perform the same duties as before, until their successors should be elected and qualified, and until otherwise provided by law or ordinance. It was declared in *The People* v. *Brown,* 83 Ill. 95, the organization of a city under the General Incorporation act determines the tenure of all offices under its special charter, except such as are within the saving clause of that act. The saving clause, however, includes no such officers as assessor and tax commissioner; but under the general law the city council had the power, in its discretion, from time to time, by ordinance passed by a vote of two-thirds of all the aldermen elected, to provide for the election by the legal voters of the city, or the appointment by the mayor, with the approval of the city council, of certain enumerated officers, and "such other officers as may by said council be deemed necessary or expedient." Under the comprehensive power conferred, no reason is perceived why the city council could not, in its discretion, subject to constitutional restrictions, create any office it deemed necessary to the efficient administration of the city government established, and provide for filling such offices by election or appointment. That discretion existed, and, in the absence of evidence to the contrary, the presumption ought to be indulged, the city council had, in some lawful way, exercised the discretionary power with which it is clothed, in the creation of such offices, or else it would not have been guilty of the extreme folly of making appropriations for pay-

ing the expenses of such offices when none existed.  In a collateral proceeding, there is no warrant for declaring the incumbents were not rightfully exercising the functions of such offices, and entitled to receive the emoluments connected therewith.

A sum insignificant in amount was also appropriated to pay expenses of entertaining official visitors, and the point is pressed on the attention of the court, but not with much earnestness, that that is an illegal purpose, and hence the tax levied to pay the same is void.  No warrant is found in the General Incorporation act for any such appropriations, but the special charter under which the city had been incorporated contained a provision expressly authorizing expenditures for entertainment of official visitors.  By a provision in the general law, cities adopting it may still exercise such powers as were conferred by the special charters under which they had previously been incorporated as are not inconsistent with the General Incorporation act.  That was so declared in *The People* v. *Brown,* cited *supra.*  No conflict exists between that provision of the special charter authorizing expenditures for entertaining official visitors, and the general law, and as to the propriety of such appropriations, that is with the city council.

It is suggested the enacting clause of the appropriation ordinance of June 30, 1875, is not in conformity with the statute, and for that reason is void.  The alleged error consists in the use of the word "common," instead of "city council." It admits of some discussion which was the most appropriate term to use; still, the error insisted upon, if error at all, is not of sufficient gravity to vitiate an ordinance in all other respects lawfully adopted.  "Common council" and "city council," ·if not equivalent expressions, the shade of difference in meaning is so slight as to be scarcely appreciable. Both expressions are used as convertible terms to represent the legislative department of a city government.

It is shown the appropriation ordinance was published in the corporation newspaper within a few days after its passage,

and afterwards in a German newspaper, and in pamphlet form, with other proceedings of the city council. That was a sufficient publication, and the objection it was not published as an *ordinance* seems hypercritical. What possible difference can it make whether it was published separately or with other proceedings of the corporation? In either case it would be published as an *ordinance*, and that is sufficient.

Although it is insisted in argument a part of the town taxes included in the judgment rendered against the property of contestants are illegal, we do not find that any specific objection was relied on in the court below. There is the general objection in the 13th specification, the "alleged State, county, town, village, city, and other taxes, and each of them, are and is invalid and unauthorized, and if not in whole, then in part." But wherein the town taxes, or any part of them, are invalid, is not set forth, except in a general way, that the assessments and valuations upon which the taxes purport to rest for their validity, are "illegal, unauthorized, and void."

Our views on the general objection taken have been expressed in considering other points made in the argument, and it is a matter of grave doubt whether counsel ought to be permitted, in this court, to insist upon specific objections not shown by the record to have been made in the court below. Such a rule might lead to mischievous results to the public interest, and induce endless and expensive litigation. Where any specific or merely formal defects exist, it is possible they might be obviated by proof or by amendments to the record, under our statute, which allows liberal amendments in tax proceedings. Such amendments as could be made in personal actions are allowable, and any omission or defective act of any officer connected with the assessment or levying of such taxes, in the discretion of the court, may be corrected, supplied and made to conform to law, either by the court or by the person in the presence of the court from whose neglect or default the same was occasioned. Hence the necessity that all specific as well as general objections should be distinctly made in the

court below, that an opportunity might be afforded the State to make the proceedings conform to law, if it were possible to do so by amendments.

But waiving this view, we may, however, consider such objections made in argument if maintainable as would affect substantially the justness of the taxes contested.

As we understand counsel, the objections insisted upon are only to a part of the town taxes. The point is made that, under the 4th section of article 4, Township Organization act, the electors in the towns of North, South and West Chicago had no power to vote town taxes. That may be, but we do not understand the taxes litigated were so levied. It was shown the county board of Cook county ascertained and allowed, and the county clerk extended, the taxes required to be raised in these several towns, and that was regular, under section 7, article 13, of the Township Organization act.

It is said the "park taxes" for West Chicago were extended on the assessments as returned by the town assessor, except as to railroad property, and that, it is contended, was irregular. It is claimed these particular taxes should have been extended in conformity with sections 126, 127, 128 of the Revenue act. That, we think, is a misapprehension of the law. This is a local tax, and, under the second section of the act in relation to "parks and boulevards," "park taxes" are to be upon "real and personal property within such town according to the assessment roll as returned for the purposes of State and county taxation next preceding the estimate" authorized to be made. That provision of the Revenue law that requires certain taxes specified shall be extended upon valuations produced by the equalizations and assessments by the State Board of Equalization, does not include within it taxes for "park purposes," such as are included in this judgment. Besides, the objection insisted upon in no manner affects the justness of the taxes levied. The property subject to taxation bears the same relative proportion of the burden imposed that it would have done had it been extended on the equalized valua-

tion as made by the State board. But it was extended in accordance with the law which authorized the imposition of such taxes, and that was the only regular mode that could be adopted.

The case in hand presents some questions about which I am not entirely free from doubt, and impresses the mind with the exceeding great difficulty experienced in making assessments and collecting revenues where so many kinds of taxes are involved under a complicated revenue system. In the same proceeding may be involved State and county taxes, municipal taxes, park taxes, special assessments and special taxes for local improvements, and assessed by different corporate bodies under distinct enabling acts. That some slight errors may intervene, is to be expected, and I am more than ever impressed with the reasonableness of the rule declared in *Purrington* v. *The People,* 79 Ill. 11, that merely formal objections to municipal and other taxes should not be entertained when the irregularities complained of do not affect unjustly the interests of the citizen. Every one ought to be willing to bear his just proportion of the burden of taxation. A tax is treated by writers on political economy as a " just debt," due from the citizen to the State, for protection to life and property, that he is under both moral and legal obligations to discharge, and the withholding of which is deemed a public wrong. It is said the obligation proceeds from the highest considerations that concern the public welfare. The captious objector is one who is unwilling to pay a due proportion of the expenses of government that secures that protection to his property that gives it all the value it has, and without which he could not enjoy it. Without such protection, it would be a prey to every lawless depredator who might possess sufficient physical power to appropriate it to his individual use.

Our law is, that all taxes shall be levied by valuation, so that every person and corporation shall pay a tax in proportion to the value of his or its property, and such taxes shall be uniform in respect to persons and property within the juris-

diction of the body imposing the same.   But exact uniformity, either in respect to persons or property, is not attainable.   An approximation to such a result is all that can be expected.   All property, were it possible, should be made to bear its just burden of taxation, but mere irregularities that may intervene, either in making valuations or in levying taxes, will not vitiate the tax, unless where it is apparent such irregularities affect substantially the justness of the tax levied, or debars the citizen of some important right secured by law.

It is a cardinal principle, every tax should be so contrived as to take from the people as little as possible over what it brings to the treasury of the body imposing it.   It ought not to be wasted upon unnecessary officers, nor frittered away by forfeitures suffered to the State—a practice now much resorted to, as it seems to be favored by the existing Revenue law.   In this way a tax is sometimes rendered more burdensome to the people than beneficial to the State.   Some system ought to be adopted that would induce prompt payment of all taxes imposed.   Such a result would lessen, in a great degree, the aggregate amount of taxes required to be levied.   Uncertainty in taxation encourages persons who would pay no taxes whatever unless the law seized their property and appropriated it to that purpose.   Deficiencies arising from non-payments must be made up in some way from other tax-payers, and their burdens in this respect are unjustly increased.   Uniformity in payment of taxes is quite as indispensable as uniformity in levying taxes, to effect the purpose of the constitution, that every person or corporation shall be compelled to pay a tax in proportion to the value of his or its property.

The present is a time of unusual financial embarrassment, and even needful tax becomes a burden on the owner of property, but there exists no authority in courts to relax the rules of law on that account.   A precedent set now in that respect would be productive of evil results when this great depression is removed, as it must needs soon be, and would thereafter embarrass the collections of revenues indispensable to the

government of a prosperous people. Great care should be taken to levy no more tax than is needful, and prompt payment should be enforced.

There is and can be no just ground for complaint that the property of contestants in this case has been made to bear more than its just burden of taxation, and in my opinion the judgment ought to be affirmed as to all the taxes litigated.

All the members of the court concur in this opinion except as to what is said as to the validity of taxes levied by the city of Chicago to pay interest on temporary loans, and also as to the taxes levied by the city to pay expenses for entertaining official visitors. The views of the majority of the court upon those questions are expressed in the opinion of the court in this case delivered by Mr. Justice WALKER.

Mr. JUSTICE DICKEY dissenting, on certain points:

I concur fully with the views of the court on all the questions passed upon in this case, except two.

I can not agree to the views entertained by the majority of the court, as to the illegality of the city tax for interest on "temporary loans," or as to the supposed illegality of the city tax for money to entertain official visitors.

The latter is a matter of comparatively small moment, and on that subject little need be said. By a provision of the charter of the city of Chicago, express power is given to the city to make appropriations for that purpose. There is nothing in the general law for the reorganization of cities, under which that city was working at the time of this appropriation, in any manner inconsistent with that provision in the old statute. In section six (6) of art. one (1) of the general law, it is provided that "from the time of such change of organization * * * *all* laws or *parts* of laws, not inconsistent with the provisions of this act, shall continue in force and applicable to any such city, *the same* as if such change of organization *had not taken place.*" I can not think that when the statute expressly declares that in such case, *all parts* of laws, not in-

consistent, etc., shall continue in force the same as though such change had not taken place, it meant to save only laws conferring usual corporate powers not inconsistent with the act. Such powers are conferred by the general act itself and need no such saving. There are two classes of repeal by implication. First, where a new statute contains provisions so inconsistent with any provision of a former statute that they can not stand together, the former statute must yield, and cease to be operative. Second, where a new statute seems to cover a subject fully, so that it makes, of itself, a complete system of law on the subject, (so much so that it is fairly inferrable that the legislature intended it as a substitute for all former laws on that subject,) it is held that the former statutes cease to be operative, although the former statute may not be strictly inconsistent with the latter. If this clause of section six had been left out, it is plain that this general law would have been construed to be a substitute for all former statutes forming part of the old charter of a city adopting the general act. It seems to me the object of this clause in section six was to *exclude* that conclusion, and that is its only office. Any other construction makes that clause a dead letter. If it does not save such special provisions as the one in question, it does not save any thing, for, only special provisions of the old charter, not repugnant to any clause of the new, needed to be preserved by means of section six. It was inserted for some purpose, and if possible some effect ought to be attributed to it.

The matter of the tax " for interest on temporary loans " is of much greater moment, and that subject I feel it my duty to discuss more at large.

The statute requires of every city the passage of an annual appropriation bill, appropriating such sums as may be deemed necessary to defray all necessary expenses and liabilities of such corporation, specifying the objects for which such appropriations are made, and the amount appropriated for each object. (Rev. Stat. 227, sec. 89.) This is in anticipation of the tax

levy. The statute also requires that the city council shall *ascertain* the total amount of all appropriations legally made, and to be assessed and collected, and that an ordinance shall be passed levying and assessing such amount so ascertained, etc. A copy of this last ordinance is certified to the county clerk, and he is to extend the tax at a rate which will produce the amount so ascertained and certified. Upon this, the collector's warrant is founded, as regards city taxes. In the case at bar all this was done.

It is objected that so much of the appropriation bill as professes to appropriate money " for interest on temporary loans," is unlawful and void, and this because, before and at the time of the passage of the ordinance, the city of Chicago, being already indebted largely beyond the limit in the constitution, could not lawfully become farther indebted, and hence could not lawfully make temporary loans, or provide for paying interest thereon.

The items in this appropriation, alleged to be subject to this objection, are $40,000 for interest on temporary loans for the water fund, $25,000 for interest on temporary loans for the fire department, $25,000 for interest on temporary loans for the police department, and $48,690 for interest on temporary loans (purpose not specified) included in the item of $300,000, appropriated in part for interest on bonded debt.

Are temporary loans, here referred to, unlawful? According to the opinion of this court in the late case of *The City of Springfield* v. *Edwards*, 84 Ill. 626, loans by a city, in excess of the constitutional limitation, when made *on the credit of the city,* are in violation of the constitution and void; but such loans, when made *on the credit merely of taxes already levied,* and in course of collection, as I understand that opinion, are not forbidden by the constitution, for they, in no sense, constitute a debt of the city. In that case this court said:

" Appellant contends that when liabilities are created and appropriations are made, which are within the limits of the revenue accruing, to meet them, they are not debts, within the

meaning of the prohibition of the constitution; and that temporary loans are not, when within the limits of the revenue expected to be realized.

"The first branch of this position has support in *Grant* v. *The City of Davenport et al.* 36 Iowa, 396, *People* v. *Pacheco*, 27 Cal. 175, *Koppekus* v. *State Capitol Commissioners*, 16 id. 253, *The State* v. *McAuley*, 15 id. 455, *The State* v. *Medberry et al.* 7 Ohio St. 522, and *State* v. *Mayor*, 23 La. An. 358.

"These cases maintain the doctrine that revenues may be appropriated in anticipation of their receipt, as effectually as when actually in the treasury; that the appropriation of moneys when received meets the services as they are rendered,— thus discharging the liabilities as they arise, or rather anticipating and preventing their existence.

"In this view, we are only prepared to yield our assent to the rule recognized by the authorities referred to, with this qualification: First, the tax appropriated must, at the time, be actually levied; second, by the legal effect of the contract between the corporation and the individual, made at the time of the appropriation, the appropriation, and issuing and accepting of a warrant or order on the treasury for its payment, must operate to prevent any liability to accrue on the contract against the corporation.

"The principle, as we understand, is, there is, in such case, no debt, because one thing is simply given and accepted in exchange for another. When the appropriation is made and the warrant or order on the treasury for its payment is issued and accepted, the transaction is closed on the part of the corporation—leaving no future obligation, either absolute or contingent, upon it, whereby its debt may be increased. But until a tax is levied, there is nothing in existence which can be exchanged; and an obligation to levy a tax in the future, for the benefit of a particular individual, necessarily implies the existence of a present debt in favor of the individual against the corporation, which he is lawfully entitled to have paid by the levy. If the making of the appropriation and issuing and

accepting a warrant for its payment does not have the effect of relieving the corporation of all liability, or, in other words, if it incurs any liability thereby, it must manifestly incur, either absolutely or contingently, a debt.

" Where a warrant or order, payable from a specific appropriation of a tax levied but not yet collected, is accepted in exchange for services rendered or to be rendered, or for materials furnished or to be furnished, so that there is, in fact, but the exchange of one thing for another, the duty remains for the proper officers to collect and pay over the tax in accordance with the appropriation—but, obviously, for any failure in that regard, the remedy must be against the officers and not against the corporation, for, otherwise, a contingent debt would, in this way, be incurred by the corporation."

On a careful examination of the record in this case, nothing is found tending to show that the appropriations in question were made for an illegal purpose, or that the loans contemplated in the ordinance, and on which interest was to be paid, were to be effected in any manner not sanctioned in the opinion in the *Springfield case.*

Testimony was heard, showing, that on April 1, 1875 (the beginning of the fiscal year in question), the funded debt of the city of Chicago was $13,500,000, and that it had not been less than that amount since the first of July, 1870; that on April 1, 1875, the floating debt of the city, evidenced by certificates on which money had been borrowed, during the year ending on that day, was about $3,000,000; that the amount of such certificates was more in 1874 than in 1873, and was more in 1873 than in 1872.

This bonded debt of $13,500,000 was in existence at the time of the adoption of the constitution. This debt was then secured by bonds, with interest coupons attached, and these interest coupons bore interest after due, as is usual with all coupons attached to such bonds. The constitution in no way affected that indebtedness. When it declared that this city should not become further indebted until this debt should be

reduced below the constitutional limit, it was not intended
that this bonded debt, already contracted, should not continue
to bear interest and grow greater by the accumulation of in-
terest, if the city was unable to pay the interest as it fell due,
nor was it intended by that provision of the constitution that
the city should not, from time to time, have power to make
appropriations, and assess and levy taxes for the purpose of
paying interest upon that bonded debt, or for the purpose of
paying interest upon the interest mentioned in the coupons, if,
by any misfortune or misadventure, the revenue of the city,
for any given year or years, should not be sufficient to pay
necessary current expenses, and also, at the same time, to pay
the coupons as they fell due, and the interest upon coupons
past due.

It is well to remember, in this connection, that in 1871 the
principal part of this city, with its personal property, was de-
stroyed by fire. This record shows, that part of the money
for which this bonded debt was contracted, was, at that time,
in the city treasury, and was destroyed at the same time.

It ought not to be thought strange, if, in the three and a
half years which intervened between that great calamity and
the time of the passage of the ordinance in question, on April
30, 1875, the amount of revenue actually collected from an
impoverished people may not have been sufficient to pay the
necessary current expenses of the city, and at the same time
to pay and discharge the accruing interest upon this enormous
bonded debt. In such case, it was the duty of the city to
apply its revenues first to the discharge of its current expenses.
The unpaid interest upon the bonded debt, in such case, must
have remained in the hands of the coupon holders, bearing
interest, unless the city borrowed the money to promptly pay
off the coupons. This could only be done by substituting for
the coupon debt, interest bearing evidences of debt in some
other form. To borrow money to take up these interest
bearing coupons, even on the credit of the city, in such case
involved no violation of the constitution, either in letter or

spirit. The making of such loans created no debt—it simply substituted one form of interest bearing security for another. Such transactions are properly denominated "temporary loans," and the payment of interest upon such loans is not unlawful.

Nor is it to be thought strange if, in 1874, temporary loans were made, in the way suggested, for the purpose of meeting lawful liabilities growing out of this bonded debt, which was made before the constitution; and if this was accomplished by merely substituting one kind of interest-bearing paper for another, no debt was thereby created. If this were done, it was not unlawful for the city to provide for taking up such certificates of 1874, by temporary loans in 1875, nor was it unlawful to provide for the payment of interest upon such proposed temporary loans.

The items for interest on temporary loans for water, fire and police departments, relate clearly to necessary current expenses. On the principle of the *Edwards case*, the tax levy of the fiscal year of 1875 might lawfully be anticipated by interest bearing certificates, payable only out of that levy, and given directly in payment for services rendered or materials furnished, or given for money to pay for such services or materials. To meet these current expenses, and to pay the accrued interest on the bonded debt, (whether evidenced by coupons or by certificates substituted therefor,) it was known to the city council ready money would be needed before the tax levy of that year could be collected, and to meet this want the appropriation bill in question seems properly and lawfully to provide for the payment of interest on temporary loans, to be effected in a lawful manner and for these lawful purposes. It is not to be assumed that the appropriation was for an unlawful end, if its language is consonant with a lawful purpose. It is not to be assumed that the term "temporary loans" means loans to be effected upon the credit of the city, where such loans would be unlawful, unless such a meaning is unequivocally shown by the context and the circumstances under which the words were used.

· The meaning of a statute or ordinance is to be sought from its words alone, if they are unambiguous and not qualified by other parts of the same instrument. If the words are not unequivocal—are open to construction—then they are to be so construed, if it can reasonably be done, as to express and provide for that which may be lawful, though its words may be capable of a construction expressive of an unlawful purpose. This is according to the canons of construction.

Following, then, the teachings of the opinion in the *Edwards case*, the words "temporary loans," for current expenses of any kind, must not be construed to be loans, made on the credit of the city, upon contracts from which a liability, either absolute or contingent, can accrue against the city, but these words must, in such case, be construed to mean such loans as may be made, after the levy, not on the credit of the city but upon the credit, merely, of the tax levy, and payable only out of the fund to arise from the collection thereof. The term "temporary loans," in this ordinance, must, by all rules laid down by the authorities, be held to mean such as may lawfully be made, if any such can be lawfully made, and must not, in such case, be taken to mean such as the law and constitution forbid.

To validate a contract (made for the purpose of anticipating the collection of the tax) relating to necessary current expenses, according to the rule laid down in the *Edwards case*, it was only necessary that the tax, at the time of making the contract, should be actually levied, and that the legal effect of the contract should be such that it does not operate so as to incur any liability on the part of the city, either absolute or contingent. The principle is, that when the order on the treasury is issued and accepted, the transaction is closed on the part of the corporation, leaving no future obligation, either absolute or contingent, upon the city, whereby its debt may be increased. It follows, that temporary loans to raise money for a lawful purpose, not made on the credit of the city, but merely on the credit of taxes already levied, are not forbidden. The *legal*

*effect* of such transaction does not operate to create any liability against the city on the contract of loaning. The tax is actually levied, and when the certificate or order on the treasury for the payment of the loan is issued and accepted, the transaction is closed on the part of the city. There is, in fact, an exchange of one thing for another, and nothing remains but the duty of the officers to collect and pay over the tax in accordance with the appropriation. For a failure in this regard the holder of the certificate has his remedy against the officers, and not against the city.

The only question presented in this record is, whether this court will permit the collector to perform this duty thus imposed upon him.

It is contended, that tax levy is unlawful, because, before December, 1875, unlawful temporary loans had been made by the comptroller, to which this tax, if collected, will be unlawfully applied. This, if true, can not affect the question of the legality of the tax, and the proof fails to show that the allegation is true, in fact.

If the ordinance making the appropriation, and the ordinance for the levy of the tax, were valid when passed, they are still valid. The subsequent acts of the comptroller, though unlawful, can not invalidate ordinances valid at their passage, nor can the tax be invalidated by any such cause. The objection, to be effective, must reach and nullify the ordinances on which the tax levy is founded. If they be valid, all else must stand.

If a statute for appropriation, passed by the General Assembly, seems, on its face, to be for a purpose not obnoxious to any provision in the constitution, it would not be competent to call the State Auditor, or members of the finance committee who prepared the bill, to prove that the estimates which led to its enactment, related to a subject matter touching which appropriations were forbidden by the constitution; nor could such statute be invalidated in court, by proving that, under like statutes, former State officers had allowed claims,

and paid out money upon them, for purposes forbidden by the constitution.

Upon the same principle, the validity of an ordinance which, on its face, seems not obnoxious to any provision of the statute or of the constitution, can not be assailed in court by proof that the estimates which led to its passage related to a subject matter in relation to which appropriations are forbidden by law or by the constitution, or by proof that taxes collected under former ordinances of the same kind had formerly been misapplied by the city officers, and paid out for purposes thus forbidden.

Nor is it perceived, from this record, that any unlawful acts are brought home to the comptroller. It is true, part of the loans for the fiscal year of 1874 were taken up by money arising from temporary loans made in the fiscal year of 1875. It is insisted, that, by law, the loans of 1874 were chargeable only to the fund arising from the tax levy of that year, and could not lawfully be paid out of any other or subsequent fund. This position is sound on the rule announced in the *Edwards case,* if it were shown that the temporary loans of 1874 so taken up were made for the current expenses of that year. If made on account of liabilities in 1874, which lawfully grew out of and constituted part of the liability of the city on account of the bonded debt, which existed before the adoption of the constitution, then these temporary loans of 1874 were valid obligations upon the city, not dependent alone upon any special fund of 1874 for their payment; and in such case it was not unlawful for the comptroller to take up such temporary loans of 1874 by money raised by like temporary loans made in 1875. The proof fails to show that the temporary loans of 1874, so taken up, were not of a character approved by the law, and sanctioned by the constitution.

It is not sufficient to invalidate an appropriation, (whether made by the legislature of a State or the city council of a city,) to show that it may be for a purpose forbidden by the constitution. The burden of showing the illegality of the ordinance

in question, rested upon appellant.   Such an ordinance can not be set aside on this ground, unless it is made to appear clearly and affirmatively that it is for a purpose not warranted by law. Unless the objector has shown that these appropriations for interest on temporary loans, were made, when, under the constitution and law, no lawful temporary loans could be made or that provision had been made by ordinance to appropriate this tax to interest on a class of temporary loans which are forbidden, the objection can not properly prevail.   Nothing in this record approaches such a showing.

It is shown by the proofs, that the bonded debt of this city was not less than $13,500,000, at the time of the adoption of the constitution, and that the interest on that debt, runs at a rate of from six to eight per cent.   Assume, if you please, that this interest was promptly paid for 1870 and for 1871.  In October, 1871, the chief part of the city was consumed by fire.   In 1872 it lay in ashes, and its citizens were, with Herculean energy, re-building.   It will not be an unreasonable presumption, that no more money could be raised by taxation in 1872 than was demanded for current expenses of that year.   It is known to this court that a very large part of the tax levied for 1873 could not be collected, because this court decided that " the city tax act," under which it was levied, was so imperfect that it could not be made effective.   It is fair to assume that, for that year, no more taxes were collected than was needed for current expenses.   The imperfections of that law were promptly supplied by the General Assembly, but, it is known to this court that a large part of the tax levy for 1874 was not collected, for the reason that this court then decided that " the city tax act " under which it was levied was unconstitutional.

If, then, for the causes suggested, the taxes actually collected in the years 1872, 1873 and 1874, were not more than sufficient to pay the necessary current expenses of those years, it is not strange that the floating debt, consisting of unpaid coupons and interest thereon, should have been greater in 1873 than in 1872, and greater in 1874 than in 1873, or that at

the end of the fiscal year of 1874 it should amount to $3,000,000.

If the interest on this bonded debt falls due, say on July 1 of each year, the unpaid coupons on a bonded debt of $13,500-000, at seven per cent per annum, falling due in each year, amounted to $945,000. The amount of these coupons, which fell due in that case on July 1, 1872, 1873 and 1874, would, by June 30, 1875, amount (without interest on the coupons) to the round sum of $2,835,000.

The coupons bear six per cent interest, and by June 30, 1875, would be—

| | |
|---|---:|
| Interest on coupons 1872, 3 years - - - | $170,000 |
| Interest on coupons 1873, 2 years - - - | 113,400 |
| Interest on coupons 1874, 1 year - - - | 56,700 |
| Total interest on coupons to June 30, 1875 - | $340,100 |
| Principal of coupons past due - - - | 2,835,000 |
| Total floating debt, arising solely from bonded debt, on June 30, 1875 - - - - | $3,175,100 |
| To this add coupons maturing July 1, 1875 - | 945,000 |
| | $4,120,100 |
| This consists of principal of coupons $945,000 for each of four years 1872, 1873, 1874 and 1875 - - | $3,780,000 |
| And interest as above to June 30, 1875 - - | 340,100 |
| | $4,120,100 |

Interest on the principal of the coupons from July 1, 1875, say nine months, until the money could be realized out of the tax, at six per cent.    -    -    -    -    $170,100

In these computations it will be observed that no interest has been compounded—no interest has been computed upon interest, except upon the interest expressed in the body of the coupons; so, it is made to appear that this city, with all her untoward calamities had, in those three and a half years, not only always paid her current expenses, but had paid something

on the floating debt growing out of the bonded debt, so that instead of being $3,175,000, April 1, 1875, it was only $3,000,000, and instead of calling for $170,100 for interest on temporary loans to be made in 1875 on account of, and in connection with the bonded debt, call is made for but $48,600, less than one-third of that amount.

It seems to be thought strange that this floating debt should have increased from $3,000,000 on April 1, 1875, to $4,500,000 on 31st of December, 1875. It must not be forgotten that during that time the coupons falling due for 1875, say $945,000, had been added, and interest on money to pay interest (on the $3,000,000 of former coupon debt, until the collection of this tax—say nine months at rate of six per cent) say $135,000, and for money for current expenses, say $420,000, making an addition of $1,500,000, all of which would have been lawfully paid long ere this had not this tax levy been arrested, and all this in no way at variance with the doctrine of the *Edwards case.*

This estimate is made on the assumption that the coupons on the bonded debt were left to stand by simply providing yearly for the interest on the coupons by paying part of it by taxation, and part by temporary loans for that purpose. The evidence shows that instead of this, the coupons as they fell due were paid by money borrowed for that purpose, upon interest bearing certificates, and from year to year the interest on these had been paid, as would appear, by taxation, and the principal of the coupon debt, from money borrowed on like certificates to run for one year. It is plain, as already said, that this substitution of one interest bearing security for another of the same amount is not the creation of a new debt. It is a mere change in form and not in substance. The constitution was not made to control forms, but substance.

It is suggested that the term "temporary loans" *prima facie* imports the making of an absolute debt, a debt on the credit of the city, and hence the burden rested on the city to show by proof that they were not to be made on the credit of the

city—not to be made on contracts binding the city absolutely to pay.

In this suggestion lies the point on which I differ from the majority of the court. So far as I perceive, it is the only point on which there is a *direct* issue between their views and mine. To this suggestion it may be said that the term "loan" certainly does not always import a binding contract to pay. A loan may be made on a pledge of personal property, with the right to redeem, but without any obligation to do so, and without any personal promise to pay. I have also shown that it is not every binding contract to pay, made by the city of Chicago, which is unlawful, for she may lawfully make any appropriate binding contract as to matters growing out of the bonded debt existing before the constitution, if in so doing she contracts no new debt. If the loan relate to money for current expenses, it is not a binding contract upon the city, for, no matter what the form of the paper may be, its officers can not bind the city thereby. The rule laid down in the *Edwards case* confines such a paper, in its legal effect, simply to the office of an effective assignment to the holder of so much of the tax levy when collected. The city, in such case has no further concern with the temporary loan for current expenses, or with the collection of so much of the tax which has thus been assigned. By operation of law, whatever the form of the certificate, the holder is alone interested in the collection of this part of the tax. Does such burden of proof rest on such holder? It would, to say the least, seem unreasonable to adopt a rule requiring the thousand and one firemen and policemen, or their assignees, to hover around the county court, to prove that their claims are not unlawful. Such a rule would render such orders or certificates practically worthless.

The appellant made no such point in the court below, for the objectors called the comptroller as a witness, and took upon themselves the burden of proving this tax levy unlawful. Appellant ought not to be allowed to raise that point (if sound) for the first time in this court. It is not right, in my judg-

ment, for the court to reverse a judgment rendered for the collection of taxes, upon the apprehension that, when collected, they may be unlawfully appropriated to purposes not contemplated by the constitution and law. The mode of vindicating that provision of the constitution forbidding any city to become indebted above the constitutional limit, is not by an appeal to the courts to arrest the collection of a tax which may be applied lawfully without violation of the constitution. That vindication, if made in the courts, must be by proceedings forbidding the making of the inhibited contracts, or by restraining municipal officers from unlawfully applying the public money to the satisfaction of such unconstitutional undertakings, or by holding such contracts void when proceedings are instituted in court for their enforcement, or by actions against public officers, either criminally or civilly, for a violation of duty in making such contracts, or in unlawfully applying public money in payment thereof.

In such proceedings, the nature of the contracts can be investigated on proper pleadings and proofs. It is *impracticable* to set out in a collector's warrant all the facts on which the validity of each tax is supported. Such a proceeding would make that warrant in the county of Cook too voluminous to be brought before any court.